WELLER v. CHICAGO, MILWAUKEE & ST. PAUL RAILROAD COMPANY, Appellant.

In Banc, June 29, 1901.

1. **Negligence:** RAILROAD CROSSING: LOOK AND LISTEN: NO EVIDENCE: PRESUMPTION. It is the duty of one about to cross a railroad track to look and listen, and if there are any difficulties in the way of his seeing and hearing an approaching train he should stop, and if in acting in accordance with such duty he could have discovered the approach of the train and did not do so, he was guilty of contributory negligence. But in the absence of any evidence to the effect that he did not look and listen before he attempted to cross the track, it must be presumed that he did so and was otherwise in the exercise of proper care. The burden of proving contributory negligence is on the defendant, and in the absence of evidence establishing this defense the presumption is that the traveller or pedestrian was in the exercise of proper care.

2. ———: ———: ORDINANCE: SPEED OF TRAIN: LIGHT: BELL: PRESUMPTION. A traveller or pedestrian about to cross a railroad track within an incorporated city, has the right to presume that those in charge of an approaching train will obey the city's ordinance regulating the speed of trains, and requiring to be placed on every moving train, after sunset, one large lamp, headlight or lantern, conspicuously placed in front of the train facing the direction in which the same may be moving, and requiring the engine bell to be rung eighty rods from the crossing and to be kept ringing until the train passes the crossing.

3. ———: ———: PRESUMPTIONS: CONTRIBUTORY NEGLIGENCE: PROOF REQUIRED. The plaintiff, being entitled to the presumption that the deceased traveller or pedestrian, in the absence of evidence to the contrary, exercised proper care to look and listen for an approaching train before attempting to cross the track, and to the further presumption that those in charge of the train would observe the law concerning the speed of trains, the ringing of the engine bell and the

placing of a light on the front of the train, is entitled to recover if defendant failed to obey this ordinance unless it conclusively appears from the evidence adduced by plaintiff, either by the direct or cross-examination of his own witnesses, that deceased was guilty of negligence contributory to his own injury. And in order to overcome these presumptions and defeat plaintiff's action, it devolves on the defendant railroad company to show by a preponderance of the evidence a failure on the part of the deceased to exercise ordinary care to avoid the injury, and that his failure to exercise such care was its proximate cause, and so direct and immediate that, but for the lack of such ordinary care, the injury would not have occurred.

4. ———: CONTRIBUTORY NEGLIGENCE: MATTER FOR JURY. Before the court can declare as a matter of law the injured or deceased traveller was guilty of contributory negligence in attempting to cross a railroad track, the evidence must be substantially all one way, and not such that reasonable minds might differ with respect thereto. To justify the court in taking the case from the jury, it is not sufficient that the evidence on behalf of the defendant railroad company tended to show that deceased was guilty of negligence directly contributory thereto.

5. ———: RAILROAD TRAIN: CROSSING: LIGHT ON TRAIN. The question of whether there was a violation of the city ordinance in reference to the requirement for lights on a train moving through the city after sunset, is held, under the circumstances of this case, to have been a matter for the consideration of the jury.

6. Instruction: LENGTH. An instruction may be objectionable because of its length, yet the court will not reverse a judgment on that ground.

7. ———: SPEED OF TRAIN: REBUTTAL: DISCRETION OF COURT. The order in which testimony is to be admitted at the trial is almost entirely within the descretion of the trial court, and the admission as rebuttal of testimony not strictly in rebuttal, for instance, the testimony of experts concerning the speed of trains, will not ordinarily justify a reversal of the judgment, and certainly it would not do so unless prejudicial.

Appeal from Jackson Circuit Court.—*Hon. E. P. Gates,*
Judge.

AFFIRMED.

*Frank Hagerman* for appellant.

(1) The demurrer to evidence should have been sustained, and defendant's instruction 1 should have been given, because the deceased was guilty of contributory negligence. (a) It was the duty of deceased to look and listen, and if there were any difficulties in the way of seeing or hearing he should have stopped, and if, by complying with such duty, he could have discovered the approach of the train, then he was guilty of negligence contributing to his injury. Beach, Cont. Neg. (2 Ed.), sec. 180; Harlan v. Railroad, 64 Mo. 480; Fletcher v. Railroad, 64 Mo. 484; Zimmerman v. Railroad, 71 Mo. 476; Henze v. Railroad, 71 Mo. 636; Purl v. Railroad, 72 Mo. 168; Turner v. Railroad, 74 Mo. 602; Kelley v. Railroad, 75 Mo. 138 ; Lenix v. Railroad, 76 Mo. 84; Hixson v. Railroad, 80 Mo. 340; Johnson v. Railroad, 77 Mo. 546; Stepp v. Railroad, 85 Mo. 229; Kelly v. Railroad, 88 Mo. 534; Butts v. Railroad, 98 Mo. 272; Hanlon v. Railroad, 104 Mo. 381; Dlauhi v. Railroad, 105 Mo. 645; Boyd v. Railroad, 105 Mo. 371. Such is the rule declared upon the former appeal and by recent decisions. 120 Mo. 635; Kelsay v. Railroad, 129 Mo. 362; Lane v. Railroad, 132 Mo. 4; Payne v. Railroad, 136 Mo. 562; Culbertson v. Railroad, 140 Mo. 35. (b) The noise of Weller's wagon, and any of the difficulties in the way of seeing, if existing as claimed, made it his imperative duty to stop; at least to slacken the speed of his horse. Henze v. Railroad, 71 Mo. 640; Turner v. Railroad, 74 Mo. 607; Hixson v. Railroad, 80 Mo. 341; Stepp v. Railroad, 85 Mo. 236; Kelly v. Railroad, 88 Mo. 548; Chase v. Railroad, 78 Me. 346; Fleming v. Railroad, 49 Cal. 253; Merkle v. Railroad, 49 N. J. L. 473, s. c., 9 Atl. Rep. 680; Seefeld v. Railroad, 70 Wis. 216; Mynning v. Railroad, 64 Mich. 93; Mantel v. Railroad, 33 Minn. 62; Haines v. Rail-

road, 41 Ia. 231; Benton v. Railroad, 42 Ia. 193; Mahlen v. Railroad, 49 Mich. 585; Railroad v. Holmes, 3 Wash. 202; McCrory v. Railroad, 31 Fed. Rep. 531; Tucker v. Duncan, 9 Fed. Rep. 867; McCall v. Railroad; 54 N. Y. 642; Haas v. Railroad, 47 Mich. 401; Schaefert v. Railroad, 62 Ia. 624. (c) The facts being disclosed by the testimony of eyewitnesses, there is no room for indulging in conjecture or calling to our aid any presumptions. Lynch v. Railroad, 112 Mo. 420; Mynning v. Railroad, 64 Mich. 93; Railroad v. Stebbing, 62 Md. 518; Dewald v. Railroad, 44 Kan. 591; Galpin v. Page, 18 Wall. 364; Railroad v. Holmes, 3 Wash. 202. (d) The present doctrine is, that if obstacles are in the way, looking and listening are to be done when the obstacles are passed. Kelsay v. Railroad, 129 Mo. 362; Lien v. Railroad, 79 Mo. App. 475. (e) The undisputed facts in this case supplement and make plain the omission on the former trial, i. e., the case was before (120 Mo. 635) held one for the jury because there was nothing to show that Weller was careless after passing the two houses on Fifteenth and Askew avenue and before coming in view of Collins. On this trial two eyewitnesses, Reach and Montelius, testified, and their statements, without conflict, showed that he did the same there as he did after he came within Collins's view. These undisputed statements, though coming from defendant's witnesses, are to be taken as true here. Lane v. Railroad, 132 Mo. 4; Hite v. Railroad, 130 Mo. 132. (2) There was error in giving plaintiff's instruction numbered one. This instruction was erroneous. (a) It was contrary to Sanders v. Railroad, 147 Mo. 411; Chouquette v. Railroad, 152 Mo. 257; Holwerson v. Railroad, 57 S. W. 779. (b) It was not based upon the evidence. (3) There was error in giving plaintiff's instruction numbered two. This instruction was too long, involved and complicated for the jury to understand (1 Thompson, Charg-

ing the Jury, secs. 67, 68) and it was not justified by the evidence. (4) There was error in permitting Collins to testify as to the dazzling effect of the headlight on the cable train. These questions, so asked the witness, called for what was peculiarly for the jury and for matters that the latter were as capable of knowing as the witness was. Gavisk v. Railroad, 49 Mo. 277; Eubank v. Edina, 88 Mo. 655; Gutridge v. Railroad, 94 Mo. 472. (5) The motion for a new trial was erroneously overruled as the verdict was rendered through passion and prejudice. The evidence as to contributory negligence was conclusive. There was no sufficient evidence of the violation of the light ordinance, nor of any issue as to the adequacy of the bell, and, within the rule of Powell v. Railroad, 76 Mo. 84, and Empey v. Railroad, 45 Mo. App. 426, a new trial should have been granted.

*Gage, Ladd & Small* for respondent.

(1) The court below properly refused to direct a verdict for the defendant. The presumption was that Weller, in the exercise of proper care, looked and listened as he approached the crossing. Weller v. Railroad, 120 Mo. 650; Petty v. Railroad, 88 Mo. 320; Crumpley v. Railroad, 111 Mo. 158; Schlereth v. Railroad, 115 Mo. 100; Meadows v. Insurance Co., 129 Mo. 93; Bluedorn v. Railroad, 108 Mo. 448; Parsons v. Railroad, 94 Mo. 293. As the jury are the judges of the weight of evidence and the credibility of witnesses, they had a right to say of the testimony of any given witness, "it fails to convince us;" "it fails to satisfy our minds;" "we do not believe it." This is the doctrine of this court. Gannon v. Gas Co., 145 Mo. 502; Seehorn v. Bank, 148 Mo. 265; Gregory v. Chambers, 78 Mo. 294; Wolff v. Campbell, 110 Mo. 114; Mineral Land Co. v. Ross, 135 Mo. 107; Schroeder

v. Railroad, 108 Mo. 322; Davies v. Railroad, 159 Mo. 1. When contributory negligence conclusively appears from the testimony offered by the plaintiff, the court may so declare as matter of law. But when the evidence from which contributory negligence must be found is offered by the defendant on whom the burden of establishing it rests the question is always one for the jury. There are many facts and circumstances in the case from which the jury had a right to infer that the deceased was without fault in failing to see or hear the train in time to avoid the collision, although he may have looked and listened for it with all the care required by law. Railroad v. Miller, 99 Fed. 529; Keim v. Railroad, 90 Mo. 314; Huckshold v. Railroad, 90 Mo. 548; Huntress v. Railroad, 66 N. H. 185, 34 Atl. 154; Davis v. Railroad, 68 N. H. 247, 44 Atl. 388; Kellny v. Railroad, 101 Mo. 67; Petty v. Railroad, 88 Mo. 318; Kennayde v. Railroad, 45 Mo. 255; Muscarro v. Railroad, 192 Pa. St. 8, 43 Atl. 527; Railroad v. Pearson, 184 Ill. 386, 56 N. E. 633; King v. Railroad, 79 N. W. 611; Railroad v. Harrington, 131 Ind. 426, 30 N. E. 37; Piper v. Railroad, (Wis.) 46 N. W. 165; Jennings v. Railroad, 112 Mo. 268. (2) The violation of the city ordinance as to the rate of speed, ringing of the bell, and light on the train, was negligence *per se.* This has been the settled law of Missouri for many years. Nothing can be added to the opinion of this court on this subject, per BURGESS, J., in Jackson v. Railroad, 58 S. W. 32; also Hutchinson v. Railroad, 61 S. W. 635. And besides, the case was tried below on the theory that the violation of both the ordinance relied on by the plaintiff, and the ordinance relied on by the defendant, was negligence *per se,* the court, at the instance of the defendant, instructing the jury that "any violation of a city ordinance is negligence." Defendant's instruction 8. Defendant is therefore estopped to complain of the action of the court below,

even had it been erroneous. "A party is not at liberty to complain of an instruction on the part of his adversary where his own exhibits the same fault." Christian v. Ins. Co., 143 Mo. 467; Thorpe v. Railroad, 89 Mo. 666.

BURGESS, C. J.—This is an action by plaintiff, who is the widow of William P. Weller, deceased, to recover damages on account of the death of her said husband, caused, as is alleged, by the negligence of defendant.

The accident occurred after sunset on the evening of the twelfth of December, 1887, at a point in Kansas City, Missouri, where the Kansas City Belt Railroad (over which defendant's road is operated) crosses Fifteenth street in that city.

There have been two trials in this case, each resulting in a verdict for plaintiff for $5,000. An appeal from the first judgment to this court was prosecuted by the defendant. The judgment was reversed, and the cause remanded for another trial, the case being reported in 120 Mo. 635. The case was again tried at the April term, 1897, of the circuit court of Jackson county, resulting in a judgment for plaintiff for $5,000, from which defendant appeals.

The negligent acts upon which the case is grounded are, the violation of section five of chapter thirty-seven of the revised ordinances of the city limiting the rate of speed of railroad trains to six miles per hour; the violation of section two of the same chapter, requiring to be placed upon every moving train after sunset, "one large lamp, headlight or lantern, conspicuously placed in front of the train facing the direction in which the same may be moving," and in failing to ring the bell eighty rods from the crossing or keep it ringing until the train passed the crossing.

The defenses were a general denial, and a plea of con-

tributory negligence on the part of deceased.

Fifteenth street was one of the principal thoroughfares of Kansas City, and runs east and west. At the point where the accident occurred, it is crossed by the line of defendant's railroad, which runs from northeast to southwest and crosses the highway at an angle of about thirty-three degrees. It was six hundred and twelve and one-half feet from this intersection northeast along the line of the railroad to the limits of Kansas City. Fifteenth street was one hundred feet in width. A double-track cable railroad occupied about fifteen feet in width in the center of the street. The street was not at the time graded to its full width, but had been surfaced for a distance of eighteen or nineteen feet on the north and south sides of the cable roadway. This space on either side of the cable railroad was used for vehicles. From the intersection of the railroad and the highway to the eastern city limits, along the line of Fifteenth street, was five hundred and sixteen feet. Askew avenue, the first north and south street west (towards the city), is one hundred and seven feet from the intersection of the highway and the west rail of the railroad track. On the northeast corner of Askew avenue and Fifteenth street there were two small frame houses, facing on Fifteenth street, with a frontage of about forty or fifty feet. From the point of intersection the railroad ran in a northeasterly direction in a straight line for a distance of about eighteen hundred feet, and then curved towards the east. A person standing in Fifteenth street sixty to eighty yards west of the intersection of the west rail of the railway and the highway could see the entire track for a distance of one thousand feet or more from the point of intersection northeast. Standing at a point in Fifteenth street twenty-five feet east of the east line of the small houses mentioned, one could see the track for a distance of eight or nine hundred feet from the point of intersection; standing in Fif-

teenth street on the east line of Askew avenue, he would have an unobstructed view of the track for a distance of six hundred feet northeast from the point of intersection. A railroad from Kansas City to Independence, called the "Dummy Line," had its western terminus at a small station on Askew avenue, two or three hundred feet north of Fifteenth street. From this station this line of railroad ran north to Fourteenth street, thence east on Fourteenth street to the city limits, and then bore off in a northeasterly direction. The railroad and tracks, at the location in question, which were used by the defendant, were owned by the Belt Line Railroad Company.

The deceased lived on Fifteenth street three or four miles east of the crossing. He had been to the city and was on his way home, driving a single horse or pony and light wagon along Fifteenth street on the north side of the cable track. It was dark and shortly after six o'clock. As he approached the crossing, a cable train bound east stood on the south track of the cable road, about fifty feet west of the west rail of the defendant's railroad. Another cable train bound west stood on the north track of the cable railroad about the same distance east of the intersecting point. It was a standing rule of the cable company that all its trains approaching this crossing should stop, and the conductor go ahead and see if the crossing was clear, and if so, then signal them to come on; this, whether a train was or was not within sight or hearing, or expected on the Belt Line track. But on this occasion it happened that the conductor of the east-bound cable train had rung his bell as a signal to the gripman to stop, as the gripman supposed, to allow some passengers to alight. A cable train passes over this crossing every two and a half minutes. Both these cable trains at the time had bright headlights in front, whose natural effect was to dazzle one's eyes in front of them and intensify the darkness at a distance from them so that opaque objects were

not easily distinguished until they came within their radius. Collins, the gripman on the eastbound cable train, was a witness for the plaintiff. He was a gripman for several months, had been superintendent of the Eighteenth street cable line, and familiar with the operation of switch engines and their lights in Chicago. The defendant's railroad was not completed, and one of its construction trains, whose crew had been at work five or six miles east of the city, was approaching from the northeast, bringing the men from their work. The train was composed of three or four cars and an engine hauling them, the engine backing at the time, so that the tender was at the front of the train. The defendant's witnesses testified that there were two box cars and a passenger coach. Stone and Anderson, who were mechanics employed in the construction of defendant's roundhouse, and who were in the rear car coming home from their work, testified that there was no coach upon the train, but that they were all box cars and unlighted.

Collins testified that when he first saw Weller, the latter was abreast of the cable car, driving east on the wagon road north of the cable track. The cable cars were standing there, how long is left uncertain. Collins also testified, "it might be probably a minute, more or less, that I could not be exact upon." Collins then knew that a train was coming, because about that time he first heard its rumble. Collins heard a bell twice, very low. It did not ring continuously; he heard it once before and once after he saw Weller. It did not sound like a locomotive bell; more like a cow bell, so that he was not certain from its sound whether the train which he heard was upon the Dummy Line or the Belt Line.

Before Weller passed Collins, the latter had heard the noise of his horse's hoofs or his wagon, perhaps one hundred feet back. The ground was hard.

As Weller passed, Collins hallooed to him, but Weller

paid no attention. Collins shouted to him again, and Weller then looked back over his right shoulder towards the southwest, then turned back his face to the east and almost immediately was under the train. When Collins first shouted, he could see neither train nor light on the train, although he was looking for them. He saw no train and discerned no light until after he had shouted to Weller the second time. When he at last saw it, it looked to him like a small light coming from an ordinary brakeman's lantern. The train was stopped so that its rear end was at the place where the accident occurred. It must have run about one hundred and forty feet or the length of the train. Collins testified that the train was running ten or twelve miles an hour. Stone and Anderson, who were riding on it in accordance with their daily custom for several months, testified that its speed was from twelve to fifteen miles an hour.

The witnesses for the defendant, who testified on the subject, including the fireman and engineer of the train, testified that the train was running not to exceed six miles per hour.

Weller was driving his horse in a trot at a rate of speed according to the estimates of different witnesses, of five miles an hour, or five or six miles an hour, between six and eight miles an hour.

Reach, a witness for the defendant, testified that he heard the train and the whistle and the bell, and saw a small headlight. Montelius said he heard the train, whistle and bell, and saw a small headlight. Bilty, the engineer, said there was a tail-light on the tank and that he whistled beyond Twelfth street. Anderson testified that he heard no whistle, wondered at it and spoke of it at the time. Neither did Collins hear any whistle. Fitzgerald, the fireman, testified that he

rang the bell, and that it was a good one, and that the engineer whistled.

That train usually stopped just before it reached the crossing, but for some reason it failed to observe its usual custom on this occasion.

Two witnesses on behalf of the defendant testified as to the conduct of Weller immediately before he reached the point opposite the cable car. They were Reach and Montelius. Weller's exact location when they first observed him is left somewhat in doubt, but if Montelius was accurate, he first saw Weller when the latter was at the east line of Askew avenue, or possibly one hundred feet west of that line.

Collins, for the plaintiff, testified that he was unable to state that Weller did not, after he passed him, turn his head in a slight degree; that it would be impossible for him to tell which way he turned his eyes when Weller's back was to him; that Weller might have looked in the direction of the approaching train and he (Collins) not have noticed it; that the Belt Line track was at such an angle that he could turn his eyes and look in its direction.

McMullen, who was on the cable car with Collins, and who was a witness for the defendant, testified that Weller might have turned his head and the movement escaped his notice; that on account of the angle made by the crossing, Weller would not have been obliged to turn his head in order to look up the track to the northeast; that a person could see up the track without turning his head, and by turning the eyes. Weller's sight and hearing were good.

Fitzgerald, the fireman, testified for the defendant, that the train was stopped as quick as it could possibly be done. Dwyer and O'Brien, experienced railroad men, testified on behalf of plaintiff that a train of this kind, running at a rate

of six miles an hour, might have been stopped in from thirty-five to sixty feet.

The plaintiff introduced in evidence an ordinance of Kansas City regulating the moving of trains within the limits of the city.

Over the objection and exception of defendant the court instructed the jury in behalf of plaintiff as follows:

"1.   The jury are instructed that at the time said William P. Weller was injured, the law imposed upon its servants, agents and employees of the defendant, while running, conducting or managing the locomotive and train of cars in question, the following duties:   That they should not move the same while within the city limits of the City of Kansas, at a greater rate of speed than six miles an hour; that they should not run and move said locomotive and train of cars within the City of Kansas, between sunset and sunrise, without having at least one large lamp, headlight or lantern in a conspicuous place in front of the same, facing the direction in which the same was moving; that they should immediately upon entering the City of Kansas, cause the bell on the engine to be rung, and keep the same ringing until the same should have crossed Fifteenth street.   And if the jury believe from the evidence that the agents, servants and employees of defendant, while running, conducting or managing said locomotive and train of cars upon the occasion referred to, failed to perform any one or more of the duties specified in this instruction, such failure was negligence.   And if you believe from the evidence that in consequence of such negligence any one or more of the particulars hereinbefore mentioned, the deceased received the injuries which resulted in his death, your finding should be for the plaintiff, unless you further believe from the evidence that the deceased was guilty of negligence which contributed to the injury.   And the burden of proving contributory negligence

on the part of William P. Weller rests on the defendant, and unless the defendant has proven such contributory negligence by a preponderance of the evidence, you can not find for the defendant on that ground.

"2.   The jury are instructed that if they believe from the evidence that Fifteenth street, at the point where the railroad tracks used by the defendant cross it, was a public street of the City of Kansas, and a thoroughfare used by the public for the purpose of travel to such an extent as to greatly enhance the danger of collisions and accidents on said crossings, that it was the duty of the servants, agents and employees of defendant, in managing or running said locomotive and train of cars to exercise a degree of care in the operation of said train commensurate with the danger of collisions reasonably to be apprehended at that location;

"And if the jury further believe from the evidence that the agents, servants and employees of defendant failed to exercise such commensurate degree of care in the movement of such locomotive and train of cars as it approached and passed over said crossing, either by moving the same at, considering the locality, a dangerous rate of speed, or without a large lamp, headlight or lantern in a conspicuous place in front of said locomotive, facing the direction in which the same was moving, or without keeping the bell upon such locomotive ringing from the time said locomotive reached the city limits until it had crossed said Fifteenth street, such failure in any of said particulars constituted negligence.   And if you believe from the evidence that such commensurate degree of care on the part of the agents, servants and employees of defendant moving said train, required that there should be a light upon said locomotive or train of cars sufficient to warn travelers up said Fifteenth street of its approach, and also required that there

Vol 164 mo—13

should be a bell upon said locomotive sufficient or adequate, when rung, to give timely notice of the approach of such locomotive and train to such traveler, and if you further believe from the evidence that said locomotive and train had no sufficient light, or that said locomotive had no such sufficient or adequate bell, you are instructed that such failure to exercise such a degree of commensurate care in any one or more of the particulars herein mentioned constituted negligence.

"And in passing upon the question as to whether the agents, servants and employees of the defendant were or were not negligent in running or managing said locomotive and train in any of the particulars aforesaid, you should take into consideration all the facts and circumstances which you may find from the evidence existing at the time when and at the place where the injury occurred. And if you further believe from the evidence that in consequence of such negligence in anyone or more of the respects hereinbefore mentioned the said William P. Weller received the injuries from which he died, you will find your verdict for the plaintiff, unless you further believe from the evidence that the deceased was guilty of negligence which contributed to the injury. And the burden of proving contributory negligence on the part of William P. Weller rests on the defendant, and unless the defendant has proven such contributory negligence by a preponderance of the evidence, you can not find for the defendant on that ground.

"3. Negligence on the part of the deceased which will prevent the plaintiff recovering in this action must be such as directly contributed to his injury, and consists of the want of ordinary care. Ordinary care means that degree of care which may be reasonably expected of ordinarily prudent persons in the situation of plaintiff's husband at and just before the time the accident occurred, and in determining whether the

deceased was using such care, you should take into consideration all the circumstances surrounding him at the time.

"4. By the expression, 'preponderance of evidence,' as used in these instructions, is not meant the greater number of witnesses, but the greater weight of credible testimony in the case.

"5. If you find your verdict for the plaintiff, you will assess her damages at the sum of five thousand dollars."

The defendant, upon its part, prayed the court to instruct the jury as follows:

"1. The jury will return a verdict for defendant.

"2. If, by looking or listening at any time before he reached the crossing, Weller could have discovered the approach of defendant's train in time to have avoided the injury, then the plaintiff can not recover.

"3. In this kind of a case, the mere fact that Weller was killed by defendant's railroad engine gives plaintiff no right to sue and recover damages. Before, in any event, plaintiff could recover, you must find from the greater weight of all the evidence in the case that his death was actually caused by some act of negligence on defendant's part submitted to your consideration. If it was not so caused, that is the end of the case, and the verdict must be for the defendant. Or if the actual cause of Weller's injury was a failure on his part to exercise reasonable prudence, then plaintiff can not recover. But even if you should find that some negligence of defendant was the cause of the death, still plaintiff can not recover if Weller failed to exercise reasonable care and prudence and thereby contributed to his injury. The difference between negligence on defendant's part, if any, and negligence, if any, on the part of Weller, is this: Defendant's negligence must be found to have been the cause of the injury, whereas, Weller's negligence, if any, would defeat a recovery if it but contributed to such in-

jury, even though it was not the only cause thereof and even though it occurred with negligence on defendant's part.

"4.   If Weller, at no time after he got to Askew avenue, stopped, looked or listened for approaching trains, but drove on in a trot till the collision occurred, then your verdict must be for the defendant, no matter what other facts you may find, and regardless of what is said in any other instruction.

"5.   The railroad track was in and of itself a warning of danger.   The evidence in this case shows that Weller was familiar with this crossing.   It was his duty to carefully look for approaching trains and to exercise reasonable care to see if they were approaching before going on the crossing.   If, by the exercise of such care as ought to be reasonably expected of a man of reasonable care and prudence, he could have discovered the approach of the train before he got to the crossing, then your verdict must be for defendant, and this is so, even though you find that defendant was negligent in some respect submitted.

"6.   If, by reason of darkness and because the headlight of the cable car was directly in front of him, there was difficulty to Weller in seeing approaching trains, it was his duty to carefully listen for same; and if by reason of noise from his moving buggy his hearing was interfered with, then it became and was his duty to stop his horse and look and listen for trains.   If you find that Weller did not comply with his duty, as in this instruction defined, then you must return a verdict for defendant, even though you may find that defendant was negligent in some respect submitted.

"7.   If Weller at the time of his injury was driving his horse faster than a moderate gait, then the plaintiff can not recover herein.   In determining whether the gait was faster than moderate, the jury have the right to consider that he was approaching a railroad crossing, that two cable trains were

waiting for defendant's train to pass, and all the facts and circumstances in evidence, and determine therefrom whether, in view of the place and situation, the gait of the horse was faster than moderate.

"8.   Any violation of a city ordinance is negligence, and if Weller violated the ordinance of the city, read in evidence by defendant, and thereby contributed to his injury, then plaintiff can not recover.

"9.   While the court says, in instruction given at plaintiff's request, that the burden of proof is upon defendant to prove negligence on Weller's part, yet that does not mean that it must be proven directly by witnesses offered by the defendant.   The court only means that, from all the facts and circumstances in evidence, whether shown by witnesses for plaintiff or defendant, you must find from the greater weight of the testimony that there was such negligence.

"10.   If, by looking and listening at any time before he reached the crossing, Weller could have discovered the approach of defendant's train in time to have avoided the injury, then the plaintiff can not recover.

"11.   Under the ordinance of the city, there was no requirement that the engine should have a headlight similar to that usually placed on the front end of engines.   The ordinances required either a large lamp, headlight or lantern, and any one of the three was a compliance therewith.

"12.   Even if you should find that the speed of the train was greater than six miles an hour, yet unless you further find from the evidence that the rate of speed in excess of six miles an hour was the cause of the injury, the question of negligence as to the rate of speed will not be considered by you.

"13.   All of the instructions read to you are the court's instructions and must be taken and considered by the jury the same as if read to you by the judge from the bench."

The court gave all instructions asked by defendant except those numbered one and two, which were refused, and defendant excepted.

It is said that the demurrer to the evidence should have been sustained because it was the duty of deceased to look and listen, and if there were any difficulties in the way of him seeing and hearing he should have stopped, and if in acting in accordance with such duty, he could have discovered the approach of the train, he was guilty of negligence contributing to his injury. That this insistence is in accordance with the general rule in such cases and is well-settled law, is abundantly shown by the numerous authorities cited by counsel for defendant in his brief. But the presumption must be indulged that deceased did look and listen before attempting to cross the track, that is, that he was in the exercise of proper care. In passing upon this question when the case was here before, MACFARLANE, J., in speaking for the court, said:

"In the absence of all evidence, did the jury have a right to draw the inference that deceased did what common prudence and ordinary care demanded of him? The rule of law that ordinary care requires a traveler at a railway crossing to look up and down the track, when the view is unobstructed, before venturing to cross it, is drawn from the ordinary conduct of the average of mankind in the daily affairs of life. From the same source is deduced also a correlative rule that, in the absence of direct evidence or rebutting circumstances, one, in attempting to cross a railroad track, will be presumed to have been in the exercise of proper care. [Petty v. Railroad, 88 Mo. 320; Schlereth v. Railroad, 115 Mo. 87; Crumpley v. Railroad, 111 Mo. 158.] In this case, had there been no witness to the conduct of deceased, and it had been shown that defendant was negligent in failing to comply with the ordinance requiring the train to carry a light, then the jury might

have drawn the inference that deceased looked for a train, and failed to see on account of the default of those in charge of the train. In such case the question of contributory negligence would have been one for the jury, to be determined in the light of all the circumstances." [120 Mo. l. c. 650.]

The same rule is announced in the case of Buesching v. St. Louis Gas Light Company, 73 Mo. 219, wherein it was said that, "the presumption of due care always obtains in favor of plaintiff in an action to recover damages for an injury sustained by him through the alleged negligence of another." [See also Petty v. Railroad, 88 Mo. 306; Crumpley v. Railroad, 111 Mo. 152; Schlereth v. Railroad, 115 Mo. 87; Meadows v. Insurance Co., 129 Mo. 76; Bludorn v. Railroad, 108 Mo. 439.]

Deceased had the right to presume that the defendant would obey the ordinance of the city regulating the speed of railroad trains, and requiring to be placed on every moving train after sunset, one large lamp, headlight or lantern, conspicuously placed in front of the train facing the direction in which the same may be moving, and requiring the bell to be rung on the engine on all such trains eighty rods from the crossing, and to be kept ringing until the train passed the crossing (Petty v. Railroad, 88 Mo. 306; Crumpley v. Railroad, 111 Mo. 152; Jennings v. Railroad, 112 Mo. 490; Sullivan v. Railroad, 117 Mo. 214); and when these presumptions, together with the presumption that the deceased was at the time of the accident in the exercise of due care, are indulged, the plaintiff was entitled to recover unless it conclusively appeared from the evidence adduced by plaintiff, either by the direct or cross-examination of her own witnesses, that her deceased husband was, guilty of negligence contributing directly to his own injury. [Stone v. Hunt, 94 Mo. 475; Buesching v. St. Louis Gas Light Co., 73 Mo. 219; Warren v. St. Louis Merchants

Exchange, 52 Mo. App. 157.]   And in order to overcome the presumption and to defeat plaintiff's action, it devolved upon defendant to show by the weight of the evidence, a failure on the part of deceased to exercise ordinary care to avoid the injury, and that his failure to exercise such care was its proximate cause, and so direct and immediate that, but for the want of such ordinary care, the injury would not have occurred.

In the former opinion it was intimated that if it had been shown that Weller, after he passed the cable car at Fifteenth street and Askew avenue, exercised no more care than when he got even with the cable car, plaintiff would have had no case, and to meet this intimation, defendant, upon the last trial, introduced two witnesses namely, Reach and Montelius.

Reach stood on the sidewalk, he says, about fifteen feet east of the butcher shop which occupied one of two small houses on the northeast corner of Fifteenth street and Askew avenue. This would locate him about fifty-five feet east of that corner. He testified that "Weller was about in front of the butcher shop when I first saw him; perhaps a little west of there;" and that from the time he saw him he just kept on going and made no stop until the engine struck him; that he saw him from the time he first heard his wagon at the butcher shop up to the time he was struck; that just as he passed the cable train some one on the grip hallooed at him, but he did not seem to pay any heed, and then some one hallooed again, and just before the train struck him he looked back over his right shoulder.

"Q.  What attention did Weller pay, if you could see, to the approach of this train?   A.   Not any I could notice, unless it was at the last moment.

"Q.   That was just as he was struck—just at the time he was struck?   A.   Yes, sir.

"Q. You don't know whether he did it then or not? A. No, sir.....

"Q. Which way was he looking? A. Looking straight in front of him; as near as I could see he was looking directly in front of him."

On cross-examination he testified:

"Q. Now, you say he was looking from the time you saw him—you saw him from the time when they first shouted to him? A. Yes; just as he passed the cable car, or perhaps a little before.

"Q. From that time you say he was looking east? A. Straight ahead; yes, sir.

"Q. You don't mean to say he didn't look up the track at any time after he left Askew avenue, do you? A. I don't think he did; I am positive he didn't.

"Q. Did you see him when he was at Askew avenue? A. About Askew avenue.

"Q. I thought you said you saw him as he passed the cable train, first? A. There was not very much difference in the distance between Askew avenue and where the cable train was.

"Q. How much difference do you think there was? A. Twenty-five, perhaps forty, feet.

"Q. Suppose it was fifty-seven feet; would you call that much difference in a distance of one hundred and seven feet? A. Yes, sir; that is quite a difference......

"Q. Do you mean to tell this jury that you know that Mr. Weller didn't look up the line of the Milwaukee track after he left Askew avenue? A. He didn't look up the line of Milwaukee track after he passed me.

"Q. When he passed you, how far were you from the track? A. I was standing, perhaps, within fifteen feet of the east line of those two buildings; and he didn't look up that

way from the time I first saw him until the train struck him.
. . . .

"Q. If he was looking east, that is, if he was facing east, going in the direction in which you state, I will ask you if, without turning his head, he could not look up that track? A. Hardly; no, sir.

"Q. He could not do it; I will ask you, if facing me, if you can see the corner of this courtroom out here, the southwest corner? A. Well, I should have to turn my head some, I should think. . . . .

"Q. Are you prepared to state, Mr. Reach, from the time he left Askew avenue, or from the time he reached that point where he could see up that track by turning his head, he never turned his head in the slightest degree, or turned his eyes up that track? A. I could not say as to his eyes. I could not say as to his eyes.

"Q. Are you able to state he didn't turn his head in the slightest degree towards the left? A. I am pretty positive he did.

"Q. You were not watching him from the time he left Askew avenue all the while. . A. I was watching him from the time I heard him approaching.

"Q. You didn't see him the time before he passed you? A. Just before he passed me; yes, sir.

"Q. Did you see him when he was on Askew avenue, then? A. About the time he passed Askew avenue the first time.

"Q. Had he gotten off Askew avenue entirely when you first saw him? A. I could not be positive whether he was entirely over Askew avenue or not.

"Q. You don't know he didn't turn his head, then, before you saw him? A. No, sir, I don't; Askew avenue, I don't think at that time ran south of Fifteenth street; I don't

think it was cut through; it would be pretty hard to tell just where. it was, when he was on Askew avenue."

The other witness, Montelius, testified that he stood at the northeast corner of Askew avenue and Fifteenth street, leaning against the banisters of the platform which ran by the house on the northeast corner, north to the Dummy Line depot on Askew avenue; that when he first heard Weller the latter was nearly opposite him; a little back of him; that he could not tell the exact distance west of him; that it must have been one hundred feet or more; that from the time he first saw him he never noticed him look in a northeasterly direction along the Belt Line tracks; that he looked straight ahead.

The substance of the testimony of these two witnesses was that they did not see or notice Weller look in the direction of the approaching train; that he seemed to be looking straight ahead.

The railroad track ran northeast from the crossing in a straight line for a distance of eighteen hundred feet before it curved to the east; at a point in Fifteenth street sixty or eighty yards west of the crossing, the view of the railroad track upon which the train was approaching was unobstructed for a distance of more than one thousand feet from the crossing; at a point in Fifteenth street on the east line of Askew avenue, one hundred and seven feet west of the crossing, a traveler would have an unobstructed view of the track for a distance of more than six hundred feet from the crossing; at a point in Fifteenth street twenty-five feet east of the east line of the small houses on the northeast corner of Fifteenth street and Askew avenue, which houses had a frontage of forty to fifty feet (probably not more than forty), the view of the track was unobstructed. for a distance of eight hundred or nine hundred feet from the crossing. On Fifteenth street, between these small houses and the crossing, there were no

obstructions of any kind, and the view of the tracks from Fifteenth street for eighteen hundred feet was clear.    The railroad tracks themselves stood up from the ground on either side of them and were built upon an elevation.    The railroad tracks, then, from different locations in Fifteenth street, from the crossing to a point sixty to eighty yards west of it, were at all times in full view of a traveler approaching over that space for distances varying from six hundred to eighteen hundred feet; and this allows for any temporary obstruction of the view produced by the presence of the two small houses on the corner of Askew avenue and Fifteenth street.

Weller lived on the extension of Fifteenth street, three or four miles east of this point; he was accustomed to travel over it; his sight and hearing were good.

Collins, the gripman, about the same time when he first shouted to Weller, when the latter was fifty feet from the crossing, first knew that a train was appoaching upon the track. He knew this from the rumble, but he had been unable to see the train or discern any light upon it up to that time, although he was watching for it.    He had heard once or twice, indistinctly, a low bell, which was not rung continuously, and he was uncertain whether the bell was from a train upon the defendant's track or belonged to a locomotive upon the Dummy Line.    Collins did not see the small and feeble light upon the approaching train until the second time he shouted to Weller, when the latter was within a few feet of the train— so close, indeed, that immediately after the second warning he was under its wheels.

As was said by counsel for plaintiff in his brief, "It may fairly be assumed that Weller, as he approached the crossing, heard the rumble and the low bell whose sound reached Collins's ears, and looked up the track of the defendant whose trains alone he was liable to meet, to see if a train was ap-

Weller v. C., M. & St. P. Ry. Co.

proaching, but seeing no light, for the same reason that Collins could see none, naturally concluded that the rumble and the bell came from some train on the Dummy Line to the north of him, from which he was in no possible danger, and supposed—as he might reasonably suppose—from the absence of any moving light on the defendant's track within his view, that the crossing was clear. If it had been daylight, Weller would have seen the train, but the darkness necessarily obscuring a view of it, he, like any other traveler, would look in the proper direction for the moving light upon it, whose presence the law required, as a warning to him of its approach. To him no light meant no train, and the want of it was notice to him that he might proceed safely on his way."

It is not sufficient that the evidence on behalf of the defendant tended to show that deceased was guilty of negligence contributing directly to his injury, but before this court can declare as a matter of law that deceased was guilty of such negligence, the evidence must be substantially all one way, and not such that reasonable minds might differ with respect thereto. This case, we think, belongs to the latter class, and was properly submitted to the jury.

It is asserted that plaintiff's first instruction is erroneous in that it bases her right of recovery upon the violation of an ordinance of the city, but as the right to maintain this action upon that ground was recognized by this court in its former opinion, and, the question expressly ruled adverse to that contention in the recent cases of Jackson v. Railroad, 157 Mo. 621, and Hutchinson v. Mo. Pac. Ry. Co., 161 Mo. 246, it is unnecessary to say more upon that subject.

The question as to whether or not there was a violation of the ordinance relative to lights on the train, was, under the evidence, a question for the consideration of the jury.

Plaintiff's second instruction is complained of upon the

grounds that it is too long, obscure and confusing, and that there was no evidence on which to base the issue as to the adequacy of the bell when ringing to give notice of the approach of the train, submitted by this instruction. But this criticism is not justified by the instruction except as to its length, and this would hardly justify a reversal of the judgment upon that ground.

Another contention is that the court erred in refusing the second instruction asked by defendant, but the points presented by that instruction were fully covered by the fourth and tenth instructions which were given in behalf of defendant, and no further instructions upon the topics were necessary.

A further contention is that error was committed in permitting the witness Collins to testify as to the dazzling effect of the headlight on the west-bound cable train.

The same point was made when the case was here before, but was not passed upon for the reason, we presume, that it was not regarded as reversible error. But whether we are correct in this view or not, the evidence was as to a fact, that is, the effect of "these particular cable lights at that time," to which any witness having personal knowledge thereof might testify.

A point is made on the ruling of the court in permitting John E. Dwyer and James O'Brien, who were witnesses for plaintiffs, to answer improper hypothetical questions in regard to the rate of speed the train was running at the time of the accident, the distance in which it could have been stopped, and other questions of like character. The objection was, as follows: "Objected to by defendant's counsel as not proper rebuttal, and as incompetent, immaterial and irrelevant, and not a proper hypothetical question, and not a proper method by which to prove the rate of speed of the train."

No principle of practice is better settled than that the order in which testimony shall be introduced in the trial of a

cause is almost entirely within the discretion of the court, and, even if not strictly in rebuttal, such an error would not ordinarily justify a reversal of the judgment upon that ground, and certainly it should not do so in this instance, because not prejudicial. No objection was made to the competency of these witnesses upon the ground that they were not qualified as experts. Nor that the facts hypothecated in the questions and answers were not in evidence, and hence these points must be considered as having been waived.

As to the contention that it is impossible for an expert to give any accurate idea of the rate of speed at which a particular train is moving, from the time or distance necessarily taken in stopping it, it has been held permissible to prove by experts within what time or distance a train running at a given rate of speed may be stopped. [Watson v. Minneapolis Street Ry. Co., 53 Minn. 551; Eckert v. Railroad, 13 Mo. App. 352.] In any event, we are unable to conceive how defendant could have been prejudiced by such evidence under the circumstances.

A final contention is that the verdict was the result of passion and prejudice, but there is nothing disclosed by the record to justify such contention. The appeal is from a second verdict for precisely the same amount as the first, which would seem to dispel any doubt as to its fairness, and leaves no ground for the assertion that it was the result of passion or prejudice.

The judgment should be affirmed, and it is so ordered. *Brace, Valliant* and *Gantt, JJ.,* concur; *Sherwood, Robinson* and *Marshall, JJ.,* dissent.