SARAH A. McGAHAN, Appellant, v. ST. LOUIS TRANSIT COMPANY.

Division Two, March 5, 1907.

1. **CONTRIBUTORY NEGLIGENCE: Collision: Presumption: Overcome by Evidence.** In the absence of evidence to the contary, it may be conceded that the deceased motorman, running his car on a single-track road, saw the car coming from the other direction, with which his collided; yet when it is conclusively shown by plaintiff's evidence that, by the exercise of due diligence, he could have seen the approaching car, or that he did see it but failed to stop his car in time to avoid the collision, the presumption that he was in the exercise of due care is overcome.

2. ———: ———: **Negligent Order.** Whatever order the motorman may have been given by defendant's foreman respecting the time in which he should make a certain run, and however negligent that order, that would not release him from the duty of exercising due care in handling or operating his car and in avoiding collisions with cars or other obstructions which might be on the track.

Appeal from St. Louis City Circuit Court. — *Hon. James R. Kinealy,* Judge.

AFFIRMED.

*A. R. Taylor* for appellant.

The evidence tends to prove that a car, standing at either the east or west intersection of the Y track with Clayton track, would not be visible at any or a few places along the branch track, as it wound down the hollow in the shape of an S, or indeed at the West End Heights; so that it would be straining credibility to declare as a certainty that McGahan must have seen the car ahead of him. His lips are sealed. His conductor didn't see the car, aye, didn't expect a car there. The law presumes that McGahan was in the exercise of due

care. Buesching v. Gas Co., 73 Mo. 233; Crumpley v. Railroad, 111 Mo. 158; Weller v. Railroad, 164 Mo. 199; Stone v. Hunt, 94 Mo. 475; Warren v. St. L. Mer. Exchange, 52 Mo. App. 157. We respectfully submit that there is no evidence in the record either that he saw, or could see, the car ahead of him from the West End Heights, or at any point on the journey down the branch road. One of the witnesses testifies that he might or might not. The court, upon contemplation of the situation, will see that it is doubtful whether a car could be seen at either end of the Y switch by reason of the rough, uneven surface of the country south of the Clayton track. At the mouth of the hollow the Y track branched on track going east a hundred feet to a connection with the Clayton Road, and the other the same distance westward to the connection, so that the car at either connection would not be visible through the hollow. We submit that in this state of the record it would be a reckless guess to declare that the deceased, in the exercise of ordinary care, must have seen the car down at the Clayton connection. Eckhard v. Railroad, 190 Mo. 611.

*Glendy B. Arnold* for respondent; *Boyle & Priest* of counsel.

Both of plaintiff's witnesses swore that a person at the Clayton connection could see up the track more than seven hundred feet. Silvey, the conductor, says the accident occurred about from one hundred and fifty to two hundred feet from the Clayton connection; so, if their testimony is true, and we must assume that it is true, we do not believe it "would be straining credibility to declare as a matter of certainty that Mc-Gahan must have seen the car ahead of him," and that the motorman on the other car must have seen Mc-Gahan's car. McGahan could have seen the other car when he was at a point five hundred and fifty feet south

of the place of the collision. Under these facts it was the duty of the court to declare, as a matter of law, that plaintiff was not entitled to recover, because all men would agree upon this showing that McGahan was not in the exercise of ordinary care at and just before the time he received his fatal injuries.

BURGESS, J.—Plaintiff, the widow of James Mc-Gahan, deceased, sues to recover of the defendant damages in the sum of $5,000, under sections 2865 and 2866, Revised Statutes 1899, for the killing of her husband by reason of the negligence of the servants and employees of the defendant.

The petition, after alleging that plaintiff was the lawful wife of James McGahan at the time of his death, and that defendant was a corporation and a common carrier of passengers, and that her husband was, on the 10th day of November, 1901, a motorman on defendant's extra car running from Third street and Washington avenue in the city of St. Louis to the connection of the branch of said railway with another line running west from Forsythe Junction into St. Louis county, and that that part of defendant's line from the city limits to its western terminus and connection with the line of railway running from Forsythe Junction into the county was a single track, and that her husband and defendant's conductor in charge of said extra car were ordered by defendant's officers to run said car from Third street and Washington avenue to the western terminus of said line in forty-five minutes, charges:

(1). That defendant's officers and agents negligently commanded plaintiff's husband, the motorman, and the said conductor in charge of said extra car, to make said run in forty-five minutes;

(2). And negligently failed to give them any no-

tice or warning that another of defendant's cars was then on said single track branch of said road; and,

(3). Negligently failed to provide any rule or warning by which plaintiff's husband and said conductor would know of the presence of said other car on said single track branch of said road, and that in consequence of such negligence the car on which plaintiff's husband was motorman was caused to collide, on said branch track, of said railway, about two hundred and fifty feet from the terminus thereof, with another of defendant's cars running in an opposite direction thereon, whereby plaintiff's husband was so injured as the result of said collision that he died on the 13th day of November, 1901.

Defendant's answer, after the general denial, charged the following matter as a defense to plaintiff's petition:

"Further answering defendant states that the injuries, if any, alleged in plaintiff's petition to have caused the death of James McGahan, were caused: (1) By the negligence of James McGahan in this, (a) That in violation of his instructions and in violation of his duty to use ordinary care, he failed and neglected to wait on a switch constructed and provided for that purpose, for the southbound car, with which the car operated by said McGahan collided; (b) That he so carelessly and negligently operated his car as to bring it into collision with a car proceeding in the opposite direction on the same track; (2) By the negligence of the fellow-servants of said McGahan, to-wit, the motorman and conductor of the car with which the car operated by McGahan collided, and the conductor of McGahan's car, who so carelessly and negligently operated the cars in their general control as to bring them into a collision."

At the close of plaintiff's evidence the defendant interposed a demurrer thereto, which was sustained,

whereupon plaintiff took a nonsuit with leave to move to set the same aside, and within four days next thereafter filed her motion to set aside the nonsuit, which was overruled by the court, to which plaintiff duly excepted. Judgment was then rendered for defendant and against the plaintiff for costs.

The salient facts are about as follows:

The plaintiff's husband was, on the 10th day of November, 1901, in the service of the St. Louis Transit Company, a street railway company, engaged in carrying passengers in the city of St. Louis, as an extra motorman. On Sunday, November 10, 1901, the plaintiff's husband and the conductor of one of said company's cars, were ordered to take out a car to be run on the tracks of the company between the terminus, Third and Washington avenue, and the junction or intersection of respondent's track with a street railway running from Forsythe Junction to Clayton, in St. Louis county. The respondent had a double track from Third and Washington avenue, the eastern terminus, to West End Heights, and from that point to the junction with the Clayton railway, a distance of five-eighths of a mile, there was a single track. From West End Heights to the Clayton Road, there was a descent, according to the evidence, of about 400 feet, and the single track, by meandering curves through a hollow or gorge, reached the level of the Clayton track at the point of intersection, and there the car turned to return to the east terminus.

In order to make the turn at the Clayton connection, respondent had constructed a Y track or tracks, and the turn of the car for its east voyage was effected by getting on the Clayton track at the east intersection of the Y track — backing west on that a hundred feet or more until the west intersection of the Y track was reached, when the car would start on its east journey.

Upon getting the order to take out the car in ques-

tion the deceased, husband of the plaintiff, and S. S. Silvey, the conductor of said car, went to the car sheds of respondent near Manchester and Compton avenues, St. Louis, and took the car out of the sheds at 12:47 p. m., November 10th, 1901, the day being Sunday. They were ordered to take the car to Third street and Washington avenue and from there start on the trip west at 1:19 o'clock p. m.

The time order was to run from Third and Washington avenue to the Clayton Road connection in 45 minutes, and leave that connection, on the return trip, at 2:04 o'clock p. m. It appears from the evidence that this was the first trip made by the motorman to the connection at Clayton Road, and that McGahan was an extra motorman, and did not have a regular car. It appears that this car got its time schedule at the car shed, the conductor taking the same from a bulletin board placed there by the foreman. The evidence showed that at the West End Heights connection with the single track there was a switch, and that the position or appearance of the switch would indicate whether there was a car on the single track; that when a car going west arrived at said switch, and it indicated that there was another car ahead, it was supposed to wait there till said other car came back, although it would appear that at times the cars arriving at the switch went forward and onto the single track even when there was another car ahead; that it took from eight to ten minutes for a car to leave the West End Heights connection, and go to and return from the Clayton Road connection, so that a car spaced four minutes behind the front car must, if it did not wait at said West End Heights switch till the front car returned, either find the front car at the Clayton Road connection or meet it on the track. It appears that the car on which McGahan was motorman was on time at the West End Heights connection, as also on time when the collision

occurred, and that prior to and at the time of the collision the car was going at the ordinary speed of five or six miles an hour. There would appear to have been no instructions given the crew of the car as to what to do or how to act on the single track, the order being simply to make the run from Washington avenue and Third street to the connection in question in 45 minutes. When within three or four hundred feet of the Clayton Road connection, the car ahead, on its return, collided with McGahan's car, and he was so injured thereby that he died from the effects of the injuries on the 13th day of November, 1901. The conductor of McGahan's car was, at the time of the collision, on the back platform talking to a passenger. He heard no bell sound or other noise made to indicate that there was a car approaching.

Plaintiff contends that the evidence tends to prove that a car standing at either the east or west intersection of the Y track with the Clayton track would not be visible at any or but a few places along the branch, as it wound down the hollow in the shape of an S, or indeed at the West End Heights, and that it would be straining credibility to declare as a certainty that McGahan must have seen the car ahead of him; that his conductor did not see nor expect a car there. That under such circumstances the law presumes that McGahan was in the exercise of due care.

It is, doubtless, true that neither McGahan nor Silvey, his conductor, saw the colliding car in time to have avoided the accident, for, had either of them so seen it, it is natural to presume that the collision would not have occurred; but if McGahan's failure to see said car was his own fault or the result of his own negligence, and the collision occurred as the consequence of such negligence, he was just as culpable as if he had seen it. And while, in the absence of evidence to the contrary, it may be conceded that McGahan was at the time of the

accident in the exercise of due care (Buesching v. Gas-
light Co., 73 Mo. 219; Crumpley v. Railroad, 111 Mo.
152) ; yet, when it is conclusively shown by the evidence
of plaintiff's witnesses, upon their direct as well as their
cross-examination, that McGahan could, by the exercise
of due diligence, have seen the approaching car or that
he did see it, but failed to stop his car in time to avoid
the collision, the presumption of due care is overcome
(Weller v. Railroad, 164 Mo. 180), and contributory
negligence upon his part fully established. While it
may be true that there is no evidence in the record that
McGahan either saw or could see the car ahead of him
from the West End Heights, the evidence shows that
the motormen and conductors in charge of both cars
had ample opportunity to discover each other in time
to avoid the collision. Both of plaintiff's witnesses
testified that a person at the Clayton connection could
see up the tracks more than seven hundred feet. Sil-
vey, the conductor, testified that the accident occurred
from about one hundred and fifty to two hundred feet
from the Clayton connection; so that, if this evidence
be true, the conclusion is inevitable that McGahan, if
looking, must have seen the car ahead of him, and the
motorman on that car have seen McGahan's car, when
the latter was at a point five hundred feet south of the
point of collision.

The first charge of negligence, which is based upon
the ground, as alleged, that defendant's employees neg-
ligently commanded McGahan to make the run from
Third Street and Washington avenue to the Clayton
connection in forty-five minutes, is not sustained, for
the evidence shows, and plaintiff concedes, that the car
was exactly on time when the collision occurred, and
was at the time running at the usual and ordinary rate
of speed from five to six miles an hour. So that, what-
ever fault, if any, there may have been in fixing the
schedule from Third street and Washington avenue to

Clayton connection at forty-five minutes, that was in no way the cause of the accident. Besides, whatever order the deceased might have been given respecting the running time of the car, that would in no way release him from the duty of exercising due care in the handling or operation of the car, and avoiding the danger of collisions with cars or other obstructions which might be on the track.

As to the second and third allegations of negligence, to the effect that defendant negligently failed to give McGahan any notice or warning that another car was on the connecting branch, and that it failed to provide any rule by which McGahan could have known of the presence of another car on the single track, the evidence showed that the switch at the West End Heights connection always indicated to the motorman whether or not a car had gone down on the Clayton branch. On this point conductor Silvey testified as follows:

"Q. Was there any place there for cars to wait — where these cars entered that switch — or about that place — so that if a car was down in there it would come on back out? A. If they said, 'Wait'—I didn't know there was another car down there.

"Q. I want to know what sort of a place there was to wait? A. A double track.

"Q. Then a switch from that double track into a single track? A. Yes, sir.

"Q. Did all the cars always run on schedule time on down to the single track without ever stopping there, or not? A. I have seen them go down there when cars were down there.

"Q. I say, was that uniformly the custom to run down there without any stop? A. If the switch is thrown they generally went on down.

"Q. If the switch was thrown? A. If the switch was thrown.

"Q. What do you mean by that? A. Shows whether the car came out.

Q. If a car had gone in there and come out the switch would show it? A. I don't know how that was.

"Q. Are you testifying to something you don't know anything about? A. I don't know anything about the switch.

"Q. Didn't you just tell the jury you knew that by that switch? A. If I would have been there myself and known it.

"Q. If you had been there you could have told by the switch. A. I think so—

"Q. Don't you know that switch indicated to every motorman whether or not any car was in there ahead of them, and that was a signal for them to wait? A. If it was open, I don't know whether it was—

"Q. Don't you know that was the custom for the motorman to be governed by the position of that switch there? A. Yes, sir.

"Q. And to look for it? A. According to whether another car—how long a car had been down there.

"Q. Now, if you waited there some little time—whether the switch indicated a car ahead—then this car could go ahead without waiting longer; is that the rule? A. That is the rule.

"Q. The rule was when they waited down there, when the switch indicated a car ahead, the rule was to run slow and keep a lookout? A. Yes, sir.

"Q. Because if a car had been down there and happened with an accident, and you waited up there a long time, or for some time, and the car didn't come, and the switch was open, that indicated there was a delay down there, then you were authorized to run down in there slow and look ahead to see what was the matter? A. Yes, sir.

"Q. Now this car ran into that switch—there is a tongue there at that switch? A. Yes, sir.

"Q. Assuming that this pencil represents the tongue of that switch, the effect of that car going down would push this tongue around straight against the rail? A. How is that?

"Q. I say the tongue of the switch would be pushed around by that going down on the branch track, would it not? A. It generally is, I think.

"Q. Now that indicated, when the tongue was lying up parallel to the rail, that the car was down ahead, didn't it? A. Went down in there?

"Q. Yes. A. Most generally that would."

It would, therefore, seem that McGahan must have known, from the condition of the switch at West End Heights, that there was another car at the Clayton connection. The evidence also showed that it was safe and customary for motormen not to wait any great length of time for cars to come from the Clayton connection, and that cars frequently went down there with the knowledge of those in charge thereof that a car was at the Clayton connection.

While it appears from the evidence that McGahan had never taken an extra car before over the single track between the West End Heights and Clayton connections, it also appears that he was an experienced motorman, and familiar with the operation of cars upon this division, having been engaged there as an extra motorman for nearly six months.

Plaintiff's petition is bottomed upon three specific acts of negligence, neither of which would authorize a recovery upon the ground that the defendant had negligently spaced the two cars that collided on the branch track. Besides, no such thing as a uniform spacing of cars is practicable on a street railway, as it is matter of common knowledge that blockades frequently occur on the streets which the operators of the lines are powerless to prevent.

Our conclusion is that the demurrer to the evidence was properly sustained. The judgment is affirmed. All concur.