[9 499
74a 398

The Chicago and Rock Island Railroad Company, Appellant, *v.* James Still, Appellee.

APPEAL FROM LA SALLE.

A railroad company should give suitable warning of danger at a common road crossing, so as to prevent injury to others as far as possible ; but this duty does not justify a person, at such a crossing, which he must know to be a place of danger, from omitting any proper act of vigilance to avoid a collision. If he

should be negligent, he must suffer the consequences, unless the other party has been guilty of misconduct still more gross and willful than his own.

Positive evidence as to the fact that a head light was burning, or that a bell or whistle was sounding, is entitled to more weight than negative evidence, in relation to such facts.

A person crossing a railroad track, who could have seen the cars approach, but turned his back to that direction, and had his ears so bandaged that he could not hear, is guilty of such negligence as will prevent his recovery for injuries, unless he can prove a greater degree of negligence on the part of the railroad company.

THIS was an action on the case commenced by Still against the railroad company. First count alleges that, on the 28th day of April, 1856, plaintiff was the owner of a two-horse wagon and two horses, and was driving along a public highway which crossed the railroad of the defendant; that the defendant, by its servants, then and there so carelessly, unskillfully and improperly drove, governed, managed and directed their steam carriages, locomotives and railroad cars, that by and through the carelessness, negligence, unskillfulness and improper conduct of said defendant, and for want of proper care and management in that behalf, the said locomotives and cars were driven against the horses of the plaintiff, and the horses killed and the wagon broken.

Second count is like the first, except that it alleges that the railroad company was an incorporated company, under and by virtue of an act to incorporate the Rock Island & La Salle Railroad Company, approved February 27, 1847, and an act to amend the same, approved February 7th, 1851.

Plea, general issue.

At the first trial the jury could not agree upon a verdict.

The cause was tried a second time on the 16th of November, 1857, before HOLLISTER, Judge, and a jury, on which trial the plaintiff called *William Miller* as a witness, who testified as follows:

I knew the plaintiff. I was at the aqueduct mill, in 1856, one evening just as it was getting dark. I stood in the door of the mill, and saw the cars coming on the railroad track of defendant. Saw, at the same time, a two-horse wagon, with a man sitting in it, going from the aqueduct up towards the railroad track at the road crossing. I watched the cars to see if they whistled. The team stepped on to the track; then Still looked up and backed up his horses. One horse was gray, and the other a dark brown. Still was traveling on the public highway. I was twenty rods from where the team was struck— perhaps a little further. I saw the train a quarter of a mile off. The team was walking. Still was sitting down in the bottom of his wagon, with his back towards the direction the cars were coming. They were coming from the east. Still was going

north.  It was a mild, misty evening.  I had no difficulty in seeing the train.  I could tell when the train came on to the bridge, as it sounds heavier and louder there.  Still was nearer the train than I.  Still might have seen the train if he had looked up and around.  You can see the cars, when coming from the east, if you are between the aqueduct and brewery, or between the brewery and the house, and from the house to the railroad track.  There was very little wind, if any.  The smoke flew south and east.  The road was frozen and pretty rough. It was a very quiet evening.  If there had been a whistle blown, I think I should have heard it.  I did not hear the whistle blow or bell ring.  I watched to see if they would blow or ring.  I thought that if they did not, Still would get caught. I do not think it was possible that I could be mistaken under the circumstances.  If the bell had rung, or whistle sounded, I certainly should have noticed it.  I was afraid there would be a collision, if they did not give the signal, and was watching to see if any was given.  The head light was not lit.  I am as sure of this as I am that the whistle did not sound or the bell ring.  The mill I stood in was Keeler's mill, in the city of Ottawa.

*Thomas Dwyer.*  I know the plaintiff.  Was anxious to have the train come along, because the time for the arrival of the train was the same as the time when we quit work.  I saw the cars coming a long way off—above the bridge.  I was watching the train, as it was pretty near time to quit work.  I also saw the train after it had crossed the bridge.  To the best of my knowledge, no bell was rung or whistle sounded.  I thought of it that night after the accident happened, that they did not ring the bell or sound the whistle.  I would not pretend to recollect positively, as it was so long ago ; but I would have taken my oath that night that the bell did not ring or the whistle sound.  I saw the horses after they were struck.  One was dead and the other nearly so ; he afterwards died.  I did'nt hear the bell or whistle.  I saw no head light on the locomotive.

*James Keeler.*  I was in the office of my mill at the time spoken of, and did not see the occurrence.  I heard the cars coming, and heard Miller exclaim, and ran out just as the train was passing.  When I heard Miller exclaim, I remarked to Brown that they had not whistled.  I should have been likely to have heard them if they had whistled.  The bell may have rung, and I not have heard it.  I saw the horses—one was dead and the other injured.  The distance is such that I could have heard the whistle if it had been sounded.  The office is a room inside of the mill.  I could hear the cars distinctly while crossing the bridge.  I can see them two or three miles off.  I should

think, in a still night, one could hear the train a mile off—certainly, forty rods.

*William Brown.* I did not hear the whistle blow. We generally hear it in the mill. When I got up to the crossing, they were trying to get one horse up. It stood up awhile, but died in an hour or so. The horses and wagon were in the ditch, on the south side of the railroad. I was in the office of Keeler's mill, and talking with him. Think he said that the whistle had not sounded—not that the bell had not rung. It was a little before dark. We could see the train a mile off. In a still night, one could hear the train a mile off. It makes a louder noise on the bridge. I have not been over the road in a wagon. The fence and trees between Everett's house and the brewery might obstruct the vision in the direction of the railroad easterly. They would do so in some places, in my opinion. The distance from Everett's house to the track is seventy or eighty feet. You can't see the east end of the bridge from there. It is about forty rods across the bottom, from the east end of the bridge to the coal bank, and the track is on an embankment. You can see a train coming across that embankment from between the track and Everett's house. The road is turnpiked up with soft earth from the railroad, south, as far as Keeler's mill race; south of the race there is hard rock. The ground was frozen. There were wagon ruts in which the water had frozen, and wagons made a creaking noise in passing over them. It is about two hundred feet from the aqueduct to the race, and about four hundred from the race to the railroad track. The road was smooth at the time spoken of. We hear the whistle blow outside of the mill as a general thing. I did feel uncomfortable toward the railroad company. I would like to have kicked some of them. They killed a cow of mine, and only allowed me half price for it.

*Miss Everett.* I remember the accident. I saw the horses. I can't tell what was the condition of the team before they were struck. My attention was not called to the question whether the signal was given. I think I should have heard the bell or whistle if they had sounded. Don't recollect of hearing either. Was busy at the time. Generally hear the bell. Can't tell whether the bell rung last Monday morning. Don't remember that it rung that night. Didn't think anything about it at the time.

*John Kieth.* I heard the cars crossing the bridge; went out and saw the horse in the ditch, and the other, much injured; he afterwards died. I think that if the whistle had sounded, or the bell rung, I should have heard them. It was the cracking of something that sounded like the snapping of glass that first

attracted my attention and made me go out. I heard the train distinctly before it got to the bridge; could hear it a mile off that night. I have driven a team across the railroad when I couldn't hear the cars. At the house, I can hear them two miles off. My attention was not called to the noise of the approaching train till the cars struck. All I swear is, that I did not hear bell or whistle. I think if they had sounded, I should have heard them.

*John Craig.* I was on the east side of Fox river, twenty or or thirty feet east of the end of the tressel work of bridge. I was going · the same way as the train; it passed me there. I heard of the accident the same night, and afterward saw the dead horses and the broken wagon. I didn't hear the bell or whistle that night. I saw the cars coming, and wondered why they did not ring or whistle. I had worked on the railroad, and knew their custom.

*John Conners.* I was at Keeler's cooper shop on the night of the accident. First saw the train three-fourths of a mile east of the bridge. Did not see the collision, on account of a small house between me and the crossing. Saw the wagon a few rods south of the crossing. Said to my brother that they ought to ring the bell, or they would catch that team. Did'nt hear the bell. Don't think it could have been rung, or the whistle blown, without my hearing them. From where I stood, Everett's house hid the track for about forty rods. The team was on a walk. I was thirty or forty rods from it. I heard the train distinctly before it crossed the bridge. It was a very still night. I could see the train a mile off. I did not hear the whistle blow; think if it had, 1 should have heard it. Don't recollect of hearing it. I heard the train half a mile off. It was opposite Everett's house when I first saw it. Think head light was lit; that they were behind time.

*Richard Thorne.* I was on board the train on the evening referred to, and heard of the accident the next morning. It was behind time. I was surprised when the train struck the bridge, as I supposed we were then three or four miles from Ottawa. I neither heard the whistle sound or the bell ring. My attention was called to the fact at the time. I was talking with a passenger. Did not hear the collision. My hearing is good. Don't think the whistle could have blown without my hearing it. I was talking with a passenger about the length of time we were in running down from Marseilles. It was some seven or eight minutes. The distance is some seven or eight miles. The train was behind time, and hardly stopped at Marseilles. I have been fifteen minutes coming down sometimes. I did not time the cars myself. Some one else did. Think I

could tell their time within two or three minutes. Think the head light was not lit at Marseilles. I did not hear the whistle. It may have blown. I was in the hind car. I would dispute the statement of any who said they heard the whistle sound. I feel confident it could not have sounded without my hearing it. The car windows were open. I have timed the train within three weeks. They ran down in eight minutes from depot to depot.

The defendant then called the following witnesses, who testified as follows:

*D. L. Carroll.* At the time of this accident, I was agent for the United States Express Company, on the Chicago and Rock Island Railroad, and was on the train at the time of this accident, and remember it. I was in the express car, next the tender. I took my money from the safe and stepped to the car door with it in my hand, while the train was on the bridge. The bell was then ringing. I stepped to the door the moment the train struck the bridge. I have no interest whatever in this matter. I pay my fare every time I go over the road. I saw the team in the ditch. I had a lantern in my hand. Did not get out of the car till it arrived at the depot. The name of the locomotive was the Des Moines. I don't think she can run a mile in a minute; don't think there is an engine on the road that can do it. Have been with the express company two years. I was near the end of the bridge when I opened the door; heard the bell before I got up, and some six hundred feet from where the team was. Should think the train was running at the rate of ten or twelve miles an hour, and was six or eight minutes behind time. I am not mistaken as to the place where the bell was ringing.

*Capt. Wheeler.* I heard part of the testimony of last witness. Was conductor on board the train spoken of. I have no interest in the result of this suit. I heard the bell ringing while we were on the bridge. One of the brakemen said we had struck a team at the crossing, and that a man was in the wagon, but was not hurt. We stopped that evening at Seneca, and I sent Ennis, the fireman, to light the head light. I saw at Ottawa that it had been lit when we got there. We did not stop at Marseilles long enough to light it there. I have been on the railroad three years or more. The Des Moines cannot run a mile a minute; don't think she could run down from Marseilles in less than twelve minutes; the usual time is twenty minutes by day, and twenty-five by night. I remember distinctly that the bell was ringing while we were on the bridge; it was rung as usual, not violently. The whistle was blown between the bridge and depot. I asked Baxter if the bell was rung before we struck

the bridge. He said it was. I might hear a bell and not remember it, unless something called my attention to it at the time. This accident made me remember it this time. It is seven miles from Ottawa to Marseilles. The train was due at Ottawa at 6.20 P. M.; it was dark when we got in. The speed was lessened when we struck the bridge; we were then running fifteen or twenty miles an hour, and were a little behind time.

*L. H. Baxter.* I was the engineer on the locomotive at the time of the accident. Have been in the employ of the company going on five years. Have been railroading fourteen years. The Des Moines has a five foot wheel. Don't think she can run down from Marseilles in less than twelve minutes. I have run it in eleven minutes with a five foot engine. It was a much smarter engine than the Des Moines. I know that the fireman commenced ringing the bell near the east end of the bridge. After passing the bridge he jumped over to my side of the engine and told me there was a team on the track. He was pulling the bell rope, and let go to come over to me. I lit the head-light myself at Marseilles that night. After that it was lit at Morris. It was not possible for me to avoid the accident after I discovered the team. I jumped off the train at Ottawa, and told the conductor that we had come in collision with a team at the crossing, and I could not tell what damage had been done. It is down grade from sixty or seventy rods above the bridge down to it. We shut off the steam above that point. Think we were going about fifteen miles an hour. I have no interest whatever in railroad company. Only work for my wages. The engineer and fireman are in more danger from a collision, or other accident, than any one on the train. I am still in the employ of the company. I think I should have remembered the ringing of the bell if my attention had not been called to it at the depot. I can swear positively that the bell was ringing when the team was hit. It commenced ringing at or near the east end of the bridge. Still, could have avoided the accident by stopping or backing off. He did not get half way across the track or I should have seen him. My business is to look ahead. I could not see the team on account of the smoke-stack and the dome of the bell. It was so dark that I don't think I could have seen the team before it reached the crossing. I consider that my life depends upon keeping a good lookout. The fireman rings the bell. My lookout is on the right hand side. I can see the entire width of the track six rods ahead. If I should look out on the other side, I should be away from my levers, and could not manage the engine. I could stop a train, running fifteen or twenty miles an hour, in running one hundred and fifty or two hundred feet. I could have stopped this train if I had

33

seen the team before we struck the bridge. I keep a lookout between the fences of the road. Not in the habit of looking outside.

*Christopher Ennis.* I was fireman on the Des Moines. I saw the team before we struck it, some ten rods, I should think. Horses stood with fore feet inside the track. Still was trying to back them up. I commenced ringing the bell before we got on to the bridge. I recollect of ringing it on the bridge. I let go the rope to tell the engineer that the team was on the track. The head-light was lit at Seneca. We were a little behind time that night. Wheeler asked me if I was ringing the bell. The team was on the track when I first saw them. If the engineer sees anything on the track he sounds the whistle. When I see anything I tell the engineer. I think I should have seen the team sooner if it had been light. I was ringing the bell. My attention was called to it at the time of the accident.

*Levi Mason.* I was ticket agent for the railroad company, at Ottawa, last winter, and was at the depot when the train came in. The head-light was burning when it came in. The Des Moines has five feet, four inch driving wheels. I have frequently timed fast trains, and never but once rode a mile a minute; that was with a seven foot driver. A five foot wheel must make about four hundred and forty revolutions the seven minutes to run down from Marseilles in that time. It would be a smart trip for her to run it in twelve minutes. Wheeler and I compared time, and I remarked that he was on time. I went up to the crossing to see what had happened, and to afford relief, if necessary. I am not now in the employ of the railroad. Still had his collar turned up and a comforter about his neck. Think he told me that he was sitting down in the bottom of the wagon, and did not see the cars at all; said he was sitting with his back towards the train. A man could see the train almost anywhere along there, by exercising ordinary diligence. You can hear the train two miles off when the ground is frozen. Still told me that they neither rang the bell nor sounded the whistle.

For the plaintiff, the court instructed the jury as follows:

1st. If the jury believe, from the evidence, that the plaintiff, at the time of the injury, was driving his horses, attached to his wagon, in a public highway, which was crossed by the railroad of the defendant; that the injury was occasioned by the locomotive engine of the defendant, with the train of cars attached, being propelled along the track of the railroad, and against the team or wagon of the plaintiff at the crossing, and that the servants of the defendant, in charge of the engine and train of cars, negligently omitted to ring the bell or sound a whistle while approaching the crossing, and that the injury resulted

from such neglect to whistle or ring, and would not have happened if they had whistled or rung and if the plaintiff exercised ordinary care and diligence to avoid the collision, the jury should find for the plaintiff.

2nd. If the jury believe, from the evidence, that the injury to the plaintiff was occasioned by a collision between the team and wagon of plaintiff and a locomotive engine of the defendant, at a place where a public road crossed the railroad of the defendant, and on such public road, and that the collision was owing to the negligent, careless and unskillful manner in which the servants of the defendant managed the locomotive and train of cars attached; and if the plaintiff used ordinary care and diligence to avoid the collision, the jury should find a verdict for the plaintiff.

3rd. The fact, if proved, that the servants of the defendant neglected to ring the bell or sound the whistle, and to continue ringing or whistling for the last eighty rods before crossing, when approaching the crossing of the public road where the injury took place, makes a *prima facie* case of negligence against the defendant.

4th. Although the jury might believe that the servants of the defendant did ring the bell and sound the whistle, or that one of these things were done, yet, if the jury believe, from the evidence, that the servants of the defendant were guilty of negligence in not ringing or whistling soon enough, or in causing the engine to be propelled too rapidly, considering all the circumstances, and the nature of the crossing; or that there was negligence in the said servants, in not keeping a proper lookout; or if in any other way they omitted and neglected to use reasonable precaution to avoid the collision, and the injury complained of was caused thereby; and if the plaintiff did use ordinary care and diligence to avoid the injury, the jury should find a verdict for the plaintiff.

5th. The law does not require that the plaintiff should have used the highest possible care and diligence to have avoided the collision. If the jury believe, from the evidence, that the collision was the result of negligence of the defendant's servants, and would not have happened if they had not been guilty of neglect; and that, under all the circumstances in which the plaintiff was placed, he used ordinary care and diligence to avoid the injury, the verdict should be for the plaintiff.

6th. Jurors are the judges of the credit that is to be given to witnesses, and they are not bound to believe anything to be a fact because a witness has stated it to be so. They are to judge of the effect that bias or prejudice, a fear of losing employment, a desire to avoid censure, a fear of offending or a

desire to please employers, if proved, or any other circumstances in testimony, operating, in the opinion of the jury, to warp the judgment and pervert the truth, has upon the human mind; and after weighing all these things, and applying their own knowledge of human nature, and of the philosophy of the human mind, to the investigation of the subject, they are to judge of the weight of the evidence, and decree accordingly.

To the giving of each of which instructions, the defendant, by its attorneys, then and there objected. The court overruled the objection, and the defendant then and there excepted.

The jury found for the plaintiff. The defendant moved for a new trial. The court overruled the motion, and the defendant then and there excepted.

The court erred in giving each of the instructions for the plaintiff, aforesaid.

The court erred in overruling the motion for a new trial aforesaid.

GLOVER & COOK, for Appellant.

BUSHNELL & GRAY, for Appellee.

WALKER, J. From the record in this case, it appears the collision took place at a point where a public highway crosses appellant's railroad track, and that appellee was, at the time, driving a two-horse team and wagon across their railroad track on the public highway, when their cars and engines were running on the road, struck appellee's team and killed his horses. The parties were each lawfully and of right traveling their several roads. They had a right to exercise this privilege, in any manner and at all times, without either interfering with or depriving the other of their legal privileges. In the exercise of these rights, each was bound to use the same amount of care and prudence to avoid a collision, and to avoid either the giving or receiving an injury. Where there is equal right there must be equal obligation. Neither has the right, because the other has omitted to use care to cease the use of efforts on his part to avoid occasioning injury to the other. That would be to permit the party guilty of the first negligence to be wantonly killed by the other party. The parties must be held, on both sides, to the use of every reasonable effort to avoid such a result; and in default of such efforts, must be held responsible for the consequences of injuries inflicted upon others or received by themselves, when they could have prevented them.

Railroad companies, in operating their cars, must be held, in crossing public highways and thoroughfares, to so regulate the

speed of their trains, and to give such signals to persons passing, that all may be apprised of the danger of crossing the railroad track. And they should also keep a lookout, so as to see, and, as far as possible, prevent injury to others exercising their legal rights. A failure in any of these duties, on their part, should render them liable for injuries inflicted, and for wrongs resulting from its omission. But, while the road is held to this degree of care, it is equally the duty of a person crossing the track of a railroad to be on his guard, and to see that he is not incurring danger to himself and to his property. He has no right to shut his eyes and close his ears to the danger he is liable to incur at such a place ; and if he does, then he must be responsible for the consequences of his carelessness, unless the other party has been guilty of misconduct still more gross and willful.

In this case there was some apparent conflict in the evidence as to the care of the appellant at the time, some of the witnesses swearing that they did not hear the signal of the bell or whistle, or see the head-light of the engine ; but a number of witnesses testify positively to the fact that the bell was rung for the usual distance, and that the head-light was burning ; and the fireman, who was then engaged in ringing the bell, was also on the lookout at the time the accident occurred. The weight of evidence on this point would seem to be clearly in favor of appellant. Appellee's witnesses only negatively testify that they did not see the light nor hear the bell or whistle, while the appellant's witnesses state positively that the bell was rung and the light was burning. The rule is familiar, that positive evidence of this character is entitled to more weight than negative.

But there is no conflict of evidence that the appellee was sitting down in the bottom of the wagon, with his back turned in the direction from which the cars were approaching, so as to prevent his seeing them. It also satisfactorily appears, that by looking in the direction of the cars, he could have seen them for a considerable distance, and for a sufficient length of time to have avoided all damage ; and that the sound of the approaching train could be heard for a distance sufficient to give ample time to have prevented this collision. He must have known that he was crossing a railroad track ; he knew that such a crossing was attended with danger, and having placed himself in a position that prevented him from being able to see the approach of the cars, and having tied up his ears in a manner that must have prevented his hearing the approach of the trains, is certainly gross negligence. And before he could recover, he should prove a greater degree of negligence on the part of the

appellant. This did not appear, from the evidence in the case. While the road might not have used every precaution that they should, yet the appellee was certainly guilty of the greater degree of negligence, and therefore is not entitled to recover. And in support of this doctrine, see *Galena and Chicago Railroad Company* v. *Jacobs*, decided at the present term of this court.

The judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*