MARION F. WINN, Admr., Appellee, *vs.* THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY *et al.* Appellants.

*Opinion filed February 19, 1909—Rehearing denied April 9, 1909.*

1. NEGLIGENCE—*failure to look or listen not negligence per se.* A traveler who approaches a railroad crossing is required to use such care as a person of ordinary prudence would exercise under the same circumstances, and this ordinarily demands the use of the faculties of sight and hearing; but it cannot be said, as a matter of law, that a failure to look or listen is under all circumstances negligence *per se.*

2. SAME—*when question of exercise of due care by deaf person is properly left to the jury.* Whether a teamster, who was somewhat deaf, could have heard an approaching train before he reached a point where he might have seen the train, and whether, if he could have heard it, he failed to use due care in driving on the track, are questions of fact for the jury, where the train was running at a speed greatly in excess of that allowed by ordinance, and there is some evidence that he looked after passing the obstructions to his view some twenty-seven feet from the track.

3. EVIDENCE—*when alleged error in admitting pamphlet of ordinances is harmless.* Alleged error in admitting in evidence, to prove an ordinance, a pamphlet of ordinances not purporting to be

*published* by the authority of the village trustees but only to be revised and compiled by such authority is harmless, where the original ordinance, in manuscript form, with the record proof of its passage, is also introduced.

4. SAME—*Wigglesworth life tables are admissible without proof that they are standard tables.* To prove the expectancy of life of plaintiff's intestate in an action for damages for death by wrongful act Wigglesworth life tables are admissible in evidence without proof that they are standard tables.

5. SAME—*plea of general issue does not put in issue the character in which defendants are sued.* Where the declaration in a suit against two railroad companies for personal injuries received by the plaintiff alleges that one defendant is the owner of the railroad and the other is operating the same, a plea of the general issue does not put in issue the question of the character in which the defendants are sued, and it is not error to admit the record of a deed in evidence to prove ownership of the road in one of the defendants.

SCOTT, J., CARTWRIGHT, C. J., and CARTER, J., dissenting.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Edgar county; the Hon. E. R. E. KIMBROUGH, Judge, presiding.

This is an appeal by the Cleveland, Cincinnati, Chicago and St. Louis Railway Company and the Cairo, Vincennes and Chicago Railway Company from a judgment of the Appellate Court for the Third District affirming a judgment recovered by Marion F. Winn, as administrator of the estate of James H. Shively, deceased, the appellee, in the circuit court of Edgar county, against appellants, in a suit for damages resulting to the next of kin from the death of appellee's intestate, alleged to have been occasioned by the negligence of appellants in running a train over the Front street crossing in the village of Kansas, in said county, at a high and dangerous rate of speed and at a rate of speed forbidden by an ordinance of the village. To the declaration the general issue was interposed. A trial by jury resulted in a verdict for $5400 in favor of appellee, upon which

judgment was entered by the court after overruling a motion for a new trial.

At close of all the evidence appellants moved the court for a peremptory instruction, which motion was denied.

The accident occurred about four o'clock in the afternoon of February 10, 1905, at appellants' railroad crossing over Front street, the principal street in the village of Kansas, a village of about fourteen hundred inhabitants. Front street extends north and south through about the center of the village, and the appellants' track crosses it and extends through the village in a north-easterly direction from the western boundary, at an angle of perhaps twenty-five degrees north of east. Located on the western border of the village, on the north side of the railroad track, fifteen hundred feet from Front street, is a canning factory. On the south side of the track, eight hundred and fifty feet west of Front street, is appellants' depot. On the same side of the track, between the station and Front street crossing, there is located a small coal shed, an elevator thirty feet in height, a small grain office, and a warehouse about twenty-five feet high and forty by eighty feet in dimensions. These buildings are separated, some by streets, and none of them are closer together than twenty feet. The warehouse, which is the building farthest to the east, is situated one hundred and nine feet south-west of the center of Front street crossing. From a point approximately twenty-seven feet south of the main track over this crossing the main track from the crossing to the depot can be seen, and on the north side of the crossing was a gong, which was operated by electricity by the telegraph operator at the station, and was sounded when a train approached. Immediately south of the warehouse, on the west side of Front street, at distances of forty and eighty feet, respectively, are two corn pens extending east and west, which are about eight feet in height. Further south of the crossing a blacksmith shop is located on the west side of Front street. Extending

along the south side of the shop is a street which intersects appellants' railway track just west of the station.

The deceased was a farmer living a few miles north of Kansas on a farm. He was about sixty years of age and slightly deaf. He was a frequent visitor in the village, and in traveling back and forth his route was over this crossing. On the day of his death he drove a team of young horses to town, hitched to an ordinary farm wagon. It was a cold, windy day, the ground was frozen and the surface of the streets was somewhat rough. During the afternoon he procured a part of a load of lumber and drove to the blacksmith shop above mentioned to have his team shod. When this job was finished Shively hitched his team to the wagon, climbed in and started home. He drove north from the blacksmith shop along Front street toward the railroad crossing. A train which was coming from the west at the time, not intending to stop at Kansas, struck and killed Shively on Front street crossing.

The ordinance relied upon prohibited any company running a passenger train within the village limits at a rate of speed greater than ten miles per hour.

It is contended by appellants that the circuit court erred (1) in refusing to direct a verdict in favor of defendants; (2) in passing on objections to evidence; (3) in instructing the jury; and (4) in overruling the motion for a new trial.

GEORGE B. GILLESPIE, (L. J. HACKNEY, R. L. McKINLAY, and HAMLIN, GILLESPIE & FITZGERALD, of counsel,) for appellants.

F. T. O'HAIR, (F. W. DUNDAS, and J. E. DYAS, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

The principal contention of appellants, and the one to which the greater portion of their brief and argument is devoted, is that the court erred in refusing to direct a ver-

dict on the ground that the evidence did not tend to show that deceased was in the exercise of due care for his safety at the time of the accident, and also that it affirmatively appears from the evidence that deceased was guilty of contributory negligence.

The evidence tends to show that on account of structures west of Front street and near the railroad track the view of the track by one approaching the crossing from the south was obstructed, and that not until within twenty-seven feet of the track could a view of it to the west be had for a distance of eight hundred feet. Deceased hitched his team to his farm wagon, in the bed of which he had a partial load of lumber, at a blacksmith shop about two hundred and fifty feet south of the crossing and started to drive north over said crossing. The weather was cold, the wind was blowing, the ground frozen and somewhat rough, and the wagon and lumber therein, which projected beyond the end of the wagon bed a few feet, necessarily made some noise. It is not clear from the evidence whether the deceased was standing on his feet in the wagon from the time he left the blacksmith shop or whether he was sitting on something. He wore a plush cap with rolls at the side that could be turned down over the ears. One witness testified that when deceased hitched his team to the wagon at the blacksmith shop the cap was down around his ears pretty well; another, a woman who saw deceased approaching the crossing and saw the accident, testified the cap was pulled down over his ears; a man who was with her at the time testified he thought the cap was pulled down over his ears, and another witness testified to the same thing, but his testimony was to some extent based upon the fact deceased usually wore his cap that way. Deceased was slightly deaf. From the time he left the blacksmith shop until he reached the railroad crossing he did not stop, and no one testified to his doing anything before he reached the crossing to ascertain if a train was approaching. There was testimony that he was

looking north as he approached the railroad track. There was testimony that the bell on the engine was ringing from the time the train left Mattoon until it stopped in Kansas after the accident, and a number of witnesses testified to the whistle being sounded fifteen hundred feet west of Front street crossing, also again at the C., H. & D. crossing, three hundred feet west of the depot, before the danger signals were given after the engineer had discovered the deceased driving upon the track. There was other testimony of witnesses in a position to have heard them, if they had been given, that they did not hear them until the danger whistles were sounded, and that at that time the engine was between the depot and the crossing. It is not denied the train was being run at a rate of speed greatly in excess of the rate permitted by the ordinances of the village. A number of witnesses testified that it was running at from fifty to sixty miles per hour. The telegraph operator at the village of Kansas testified that it was his duty to note the time of· trains, and that the train that caused the accident ran from Ashmore, four and one-half miles west of Kansas, to the village of Kansas in five minutes, which would make the rate of speed about fifty-four miles per hour. There was a warning bell on a post north of the railroad track at the crossing which was operated by electricity from the telegraph office, and a number of witnesses testified to hearing the bell ring just before the accident. These bells were rung by the telegraph operator by push buttons. There were two of these buttons, and each of them rang a bell at two crossings. The operator testified he would push one of the buttons for about five seconds and then the other one for about the same time, so that each bell was not rung constantly. One witness testified he heard the bell at Front street crossing ring a little while and then stop. The north rail of the switch track was eight feet from the south rail · of the main track. According to estimates of the witnesses, deceased himself was from ten to fifteen feet south of the

switch track, which would place him very near the line where he could first get a view of the track to the west when the danger signals were given by the engineer of the train. As deceased drove upon the track he was about forty feet ahead of a man and woman walking along the sidewalk toward the crossing, and they having heard the approaching train, the man called to deceased just before the danger signals were given. He testified he did not know whether he called loud or not; that he did not call loud enough for deceased to hear him, while the woman with him testified he hallooed loud. The deceased apparently did not hear him, but immediately after the call the danger signals were given. The horses were going upon the track when the call was made. About the time the danger signals were given, which the testimony tends to show was when the train was between four and five hundred feet west of the crossing, deceased was observed to apparently try to urge his horses across the track and then immediately pull them back. The horses appeared to be frightened at the time. At the rate of speed the train was going it would take it about nineteen seconds to reach the crossing from the time it was said to have whistled, fifteen hundred feet west of the crossing. It would run from the depot to the crossing in about ten seconds, and from Paxton's grain office, where the evidence tends to show the danger whistles were sounded, to the crossing in about five seconds.. There is some evidence that when the deceased passed the line of obstructions that prevented his seeing the track he did look. At that time the train was within a few hundred feet of him, his horses became frightened and he found himself suddenly in a perilous position. He could not then be expected to exercise the degree of care and caution a prudent man would exercise under ordinary circumstances. But appellants contend that by the exercise of reasonable care he could have discovered the approaching train before reaching a position of peril. There is evi-

dence tending to show he could not have seen the train before reaching a point within twenty-seven feet of the track. Whether he could have heard it before that time, and whether, if he could have done so, in driving on the track without stopping he failed to exercise reasonable care under all the circumstances, was a question of fact. It was incumbent upon appellee, as contended by appellants, to aver and prove that deceased was in the exercise of due care under all the circumstances, and unless this is proven there cannot be a recovery. *Jorgenson* v. *Johnson Chair Co.* 169 Ill. 429.

This court has repeatedly held that a traveler approaching a railroad crossing is required to use such care as a person of ordinary prudence would exercise under the same circumstances, and this ordinarily demands the use of the faculties of sight and hearing to discover whether a train is approaching or not, but it cannot be said, as a matter of law, that the failure to look or listen under all circumstances will bar a recovery. It is usually a question of fact for the jury to determine, in view of all the surrounding circumstances, whether failure to look and listen constitutes negligence or lack of due care. (*Chicago and Alton Railroad Co.* v. *Pearson,* 184 Ill. 386; *Pennsylvania Co.* v. *Frana,* 112 id. 398; *Terre Haute and Indianapolis Railroad Co.* v. *Voelker,* 129 id. 540; *Chicago and Northwestern Railway Co.* v. *Hansen,* 166 id. 623; *Chicago and Alton Railroad Co.* v. *Adler,* 129 id. 335; *Chicago and Alton Railroad Co.* v. *Lewandowski,* 190 id. 301; *Chicago Junction Railway Co.* v. *McGrath,* 203 id. 511; *Elgin, Joliet and Eastern Railway Co.* v. *Lawlor,* 229 id. 621.) In *Chicago, St. Louis and Pittsburg Railroad Co.* v. *Hutchinson,* 120 Ill. 587, it was held that the degree of care required cannot be formulated into a particular rule of conduct, for the reason that the conduct of ordinarily cautious and prudent men will vary with varying circumstances. In *Partlow* v. *Illinois Central Railroad Co.* 150 Ill. 321, the

court said (p. 327): "It has often been said by this and other courts that it is the duty of a person approaching a railroad crossing to look and listen before attempting to cross, and that a person failing to observe that precaution is guilty of negligence; but where the statement has been made, the court, as a general rule, was discussing a question of fact, and in such cases the statement may be regarded as accurate. But the court cannot say, as a matter of law, that the failure to look and listen is negligence. These facts are proper for the consideration of the jury in determining whether a person has been negligent, but it cannot be said, as a matter of law, that the failure to observe such acts is negligence."

In *Chicago and Northwestern Railway Co.* v. *Dunleavy,* 129 Ill. 132, the jury found, in answer to a special interrogatory, that the deceased was in the exercise of reasonable care for his safety at the time he was killed. In answer to special interrogatories whether deceased looked or whether he listened to ascertain if a train was approaching, the jury answered, "Don't know." To the interrogatory, "If the deceased had looked before the accident could he have discovered the approach of the train in time to have avoided the accident?" the jury answered, "Yes;" and to the interrogatory, "If deceased had listened before the approach of the train could he have discovered the approach of the train in time to have avoided the accident?" the jury answered, "If he had concentrated his attention in that particular direction, yes." It was contended by the railroad company in that case that the court erred in not directing a verdict and also that the special findings were inconsistent with the general verdict. The court said (p. 148): "The question then presents itself whether, if it be admitted that the deceased neither looked or listened for the train, and also that if he had looked he could have seen it and if he had listened with his attention concentrated in that direction he could have heard it in time to avoid the accident, such facts would con-

stitute such conclusive proof of contributory negligence on the part of the deceased as would have barred a recovery. Undoubtedly a failure to look or listen, especially where it affirmatively appears that looking or listening might have enabled the party exposed to injury to see the train and thus avoid being injured, is evidence tending to show negligence. But they are not conclusive evidence, so that a charge of negligence can be predicated upon them as a matter of law. There may be various modifying circumstances excusing the party from looking or listening, and that being the case, a mere failure to look or listen cannot, as a legal conclusion, be pronounced negligence *per se*. In determining whether the special findings are inconsistent with the general verdict, so that the latter must be held to be controlled by the former, this court cannot look at the evidence. All reasonable presumptions will be entertained in favor of the verdict while nothing will be presumed in aid of the special findings of fact. The inconsistency must be irreconcilable, so as to be incapable of being removed by any evidence admissible under the issues. (Citing cases.) Under these principles it must be held that there is no necessary or irreconcilable inconsistency between the special findings and the general verdict, especially in view of the fact that the jury, notwithstanding their finding that the deceased did not look or listen, also found that he was in the exercise of reasonable care."

Under the evidence in this case, and in view of the fact that appellants were running their train at a rate of speed at least five times greater than the ordinance permitted, this case must be governed by the rule announced in *Chicago and Eastern Illinois Railroad Co.* v. *Crose*, 214 Ill. 602. In that case this court said (p. 606): "It is undisputed that the train which caused the injury in this case was running at a greater rate of speed than ten miles per hour, in violation of the village ordinance, and this being so, a *prima facie* case of negligence was established against the appel-

lant, (*Illinois Central Railroad Co.* v. *Ashline,* 171 Ill. 313,) and the injury must be presumed to have been inflicted by the negligence of the appellant company or its agents operating such train, and in such case it would be liable for all damages occasioned thereby. Such presumption may be rebutted, but the question whether the appellant's evidence was sufficient, under all the circumstances, to overcome the *prima facie* proof of negligence was a question for the jury and was properly submitted to it, and the judgment of affirmance by the Appellate Court is conclusive."

For the purpose of proving the existence of the ordinance relied upon, the court admitted in evidence, over the objection of appellants, a printed copy of that ordinance contained in a pamphlet, upon the first page of which appeared the following: "Revised ordinances of the village of Kansas, Edgar county, Illinois.—Revised and compiled by order of the board of trustees, by R. S. Dyas, City Attorney, 1905." It will be observed that this pamphlet did not purport to be *published* by authority of the board. What is shown by the language quoted, so far as the board is concerned, is that the ordinances were revised and compiled by its order. If the court erred in admitting the ordinance as it appeared in the pamphlet, this error was afterward cured by the introduction of the ordinance as it appeared in the original manuscript, with the record proof of its passage.

It is also claimed that the court erred in admitting in evidence the record of a deed from the St. Louis, Alton and Terre Haute Railway Company to the appellant the Cairo, Vincennes and Chicago Railway Company. The objection is that the record is secondary evidence and no proper foundation was laid for its admission. The purpose of the introduction of the record appears to have been to prove that the Cairo, Vincennes and Chicago Railway Company was the owner of the line of railroad. The declaration charged that the Cairo, Vincennes and Chicago Railway Company

was the owner, and that the appellant the Cleveland, Cincinnati, Chicago and St. Louis Railway Company was operating the railroad. The only plea being the general issue, the character in which the defendants were sued was not put in issue. *McNulta* v. *Lockridge,* 137 Ill. 270; *Pennsylvania Co.* v. *Chapman,* 220 id. 428; *Chicago Union Traction Co.* v. *Jerka,* 227 id. 95.

To prove the expectancy of life of deceased the court admitted in evidence, over appellants' objections, the Wigglesworth life tables. It is claimed it was error to admit them without first proving they were standard. These tables have been accepted by this and other courts and acted upon for many years as standard tables without first requiring proof of that fact. In speaking of the Wigglesworth, Portsmouth and Northampton tables, this court said in *Henderson* v. *Harness,* 184 Ill. 520: "The life tables so introduced in evidence are standard and recognized mortality tables. They were properly received in evidence."

Some other objections less important in character are made to the rulings of the court in the admission of evidence, and some objections are made to the court's modification of certain instructions offered by appellants and its refusal to give others. We have examined these questions but do not find them of sufficient importance to require a discussion of them in this opinion. In our opinion there was no substantial error committed by the court in the respects complained of, and on the whole record we find no error that would justify a reversal of the judgment.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE SCOTT, dissenting:

This case was originally assigned to me for the purpose of preparing the opinion of the court. I wrote an opinion which was adopted at the last October term, and the judgments of the circuit and Appellate Courts were then reversed and the cause was remanded. Later a rehearing

was allowed upon petition of the appellee, and the cause being again considered, the foregoing opinion was written and adopted and a judgment of affirmance entered. I think that opinion, which is now the majority opinion, shows a misapprehension of the proof, and I accordingly include herein the substance of the opinion originally prepared by me so far as it deals with the controlling question in the cause, and to that portion of that opinion I add a few paragraphs.

The train was negligently operated, as charged. This is not denied. The position of appellants is, that a verdict should have been directed for the reason that there was no evidence which tended to show that the deceased was in the exercise of due care for his own personal safety during the time immediately preceding the accident. It was necessary for appellee to show, by a preponderance of evidence, that at the time of the accident, and immediately preceding that occurrence, his intestate was so in the exercise of ordinary care. *Jorgenson* v. *Johnson Chair Co.* 169 Ill. 429.

Notice must be taken of the fact that a railway crossing at grade over a highway is a place of danger, and the exercise of due care at such a place ordinarily requires something more from a traveler upon such a highway than would be required of him if he were in his own dooryard or passing along a street or highway where there was no possibility of being struck by a passing engine, and it is the duty of a person about to cross a railway track at such a place to approach cautiously and endeavor to ascertain if there is present danger in crossing. (*Pennsylvania Co.* v. *Frana,* 112 Ill. 398; *Chicago, St. Louis and Pittsburg Railroad Co.* v. *Hutchinson,* 120 id. 587.) When the deceased started north from the blacksmith shop he was two hundred and fifty feet south from the crossing of the track on Front street. North and west of the blacksmith shop, in the same block and south of the railroad right of way, were two corncribs and a warehouse, the latter being nearest the tracks.

There were spaces between the blacksmith shop and the corn-cribs and between the corn-cribs and the warehouse. Had deceased looked to the west as he passed these spaces he could have seen portions of the track of the appellants. Whether he could then have seen the approaching train can not be determined from the evidence in this case. He could not obtain an unobstructed view of any considerable portion of the railway track to the west until he had passed far enough north to reach a point where the warehouse would no longer interfere with his looking in that direction. Just how far south of the main track this point would be is not certain from the testimony. Appellee by his brief says that the point is twenty-seven feet south of the main track, and for the purposes of this opinion I accept that statement as correct. At this point, looking to the west, while standing up in his wagon, as he was, Shively could have seen an approaching train at any place between the crossing and the depot,—a distance of eight hundred and fifty-five feet,—and this he would have been able to do at any time after leaving that point until the moment he was struck by the engine. He was slightly deaf. He wore a plush cap, which he pulled down over his ears for the purpose of protecting them from the cold. He had in the farm wagon in which he was traveling, three or four hundred feet of lumber, composed of boards which were a few feet longer than the wagon bed and extended beyond the rear end of the bed. As he drove along over the frozen ground the ends of the boards so extended, as a result of the motion of the wagon, slapped together, and with the noise of the moving wagon further interfered with his hearing, so far as his ability to observe the whistling of the engine and the ringing of the gong at Front street was concerned. As he started from the blacksmith shop his horses moved at a slow jog-trot,— a little faster than a man could walk,—and continued at that rate until they reached a slight incline leading up to the crossing, where they slowed up and proceeded at a walk

until they came upon the crossing of the main track. The incline begins about forty feet south of that crossing. Before he reached the main track he crossed a switch, and further west on that switch was a coal car, which, however, would not have interfered with his seeing the approaching train had he looked after reaching the point twenty-seven feet south of the main track. The testimony of all the witnesses indicates that he did not hear the ringing of the electric gong at Front street, although it seems to have been heard by all the other persons in that vicinity who were upon the street; that he did not hear the whistling of the engine, although the danger signals emitted by the whistle were so loud and shrill that they were heard by witnesses who were in dwelling houses and in places of business in the neighborhood, and the character of those signals was so alarming, on account of their piercing quality, that several of the witnesses who were within the buildings went to the windows to ascertain, if possible, the occasion of the blasts. One man who was on the street near the wagon, as it approached the crossing, becoming cognizant of the situation, attempted to stop Mr. Shively by shouting to him. To all of this he was entirely oblivious. The testimony of practically all the witnesses shows that from the time they first observed him, some distance before he reached the point where he could see past the warehouse and along the track as far as the depot, he drove directly to and upon the main track without looking either to the east or west, until he was struck by the engine. The testimony of one or two witnesses, however, which is most favorable to appellee and which alone can be considered by us in determining whether a verdict should have been directed, is to the effect that he looked neither to the right nor to the left until the moment when he was passing upon the main track; then he looked to the east along the track, turned his head and glanced to the west, made a motion forward with his hands as though to slacken the lines and hasten the horses, and then immedi-

ately and quickly drew his hands back as though to stop the team, and at that instant the engine struck the wagon and his death resulted. The horses, with the tongue and front wheels of the wagon, were knocked off on the north side of the track, while the deceased and the parts of the wagon other than those just mentioned were thrown off on the south side.

Appellee argues the case on the theory that the acts of the deceased just recited, in looking both ways and first attempting to hasten and then attempting to stop his team, occurred when the deceased was still progressing toward the main track and before the horses passed upon it, and that his failure to take such measures as would have saved his life resulted from his excitement induced by the impending calamity, and the rule is invoked that under the stress of such a moment the law does not require him to act with the same prudence as would a person ordinarily careful under ordinary circumstances. No such construction as that contended for by appellee can fairly be placed upon the testimony of any witness. It will be found, when all the testimony of each witness is considered, that the testimony of no witness indicates that the deceased glanced west before the moment his horses passed upon the main track, when he had reached a point where the calamity could not have been averted by any human agency. After his team stepped upon the main track, when he first looked to the west and saw the approaching train, no failure to exercise due care is or can be imputed to him. No doubt he did all that any man could do after that instant to save his life, but the impact followed so suddenly that it was not then possible for him to have escaped the danger by the exercise of the highest degree of care and diligence. The lack of evidence tending to show the exercise of ordinary care which is relied upon is not a lack of evidence to show the exercise of that care after the moment at which deceased looked to see if a train was approaching from the west, but

is lack of evidence tending to show that he exercised such care, after reaching the point twenty-seven feet south of the crossing, while approaching the main track and while placing himself in position where there was no possible escape from danger attending the approach of the oncoming train.

The case is one where a man with impaired hearing, of which he was conscious, with a covering over his ears, and who therefore could not hear an approaching train, drove upon a railway crossing without taking any precaution whatever, by the exercise of his sense of sight, to ascertain whether it was safe so to do. It is true, as has often been said of persons who possessed all their faculties, that a recovery is not necessarily barred by a failure to look and listen in approaching such a crossing. The exercise of due care, however, on the part of one whose hearing does not serve him, upon approaching such a crossing, means something more than the mere quiescent and inattentive passage of the traveler. If he cannot hear, and there is nothing to prevent his looking and his attention is not otherwise engrossed, it is his duty to look. If the attention of the deceased had been attracted to some unusual display on the side of the track opposite to him, as the passage of a procession of some kind or the maneuvers of a military company, or if there had been a train standing or approaching upon another track to the east of him and he had been watching to avoid danger from that train, or if his team had been difficult to control and he had been occupied in urging them forward or in attempting to restrain them, or if he had been watching a team coming from the north, the jury could, if they saw fit, properly find that in the exercise of due care he might not look for the train approaching from the west. This record discloses no such circumstance. The uncontradicted proof is, that a man who was in a condition and situation where he was unable to hear the most piercing blasts of the whistle, without anything whatever to engross his attention, drove upon the track before exercising any

precaution by looking to ascertain whether a train was approaching. One who can both see and hear as he approaches a railway crossing, frequently, no doubt, relies upon the fact that under ordinary circumstances if a train is approaching he will hear its warning signals and its rumbling before it reaches the crossing, and that he will thus be advised of its coming without looking and without taking any special precautions to enable him to hear. Deceased could not so rely upon his hearing, because it was defective and because he had covered his ears. In order to be in the exercise of due care for his personal safety it was necessary for him to make greater use of his vision than would have been the case had he not possessed the infirmity noted and had he not placed a covering over his ears which interfered with the use of the diminished sense. (2 Thompson on Negligence, sec. 1658; *Chicago and Rock Island Railroad Co.* v. *Still,* 19 Ill. 499; *Chicago and Northwestern Railway Co.* v. *Sweeney,* 52 id. 325; *Chicago, Rock Island and Pacific Railway Co.* v. *Pounds,* 82 Fed. Rep. 217; *Phillips* v. *Railway Co.* 111 Mich. 274.) The undisputed evidence shows that he made no use of his vision that would advise him of an approaching train from the west in time to avoid danger therefrom.

In the *Still case,* after referring to the fact that the evidence as to the defendant's negligence was conflicting, the court continued: "But there is no conflict of evidence that the appellee was sitting down in the bottom of the wagon, with his back turned in the direction from which the cars were approaching, so as to prevent his seeing them. It also satisfactorily appears that by looking in the direction of the cars he could have seen them for a considerable distance and for a sufficient length of time to have avoided all damage, and that the sound of the approaching train could be heard for a distance sufficient to give ample time to have prevented this collision. He must have known that he was crossing a railroad track. He knew that such a crossing was attended with danger, and having placed himself in a

position that prevented him from being able to see the approach of the cars, and having tied up his ears in a manner that must have prevented his hearing the approach of the trains, is certainly gross negligence."

The case of *Chicago and Northwestern Railway Co. v. Sweeney, supra,* is on principle very much akin to this. There the deceased, a track repairer, had a cap drawn closely over his ears and was working with a shovel in his hands, and without looking either way for approaching cars or engines stepped upon the railway track with his back toward an approaching train, which struck and killed him. This court held no right of recovery existed. In the case at bar, it is true, the deceased did not have his back directly toward the approaching train, but the train as it approached him was to his left and slightly back of him, and the accident resulted from a failure to look, precisely as in the *Sweeney case.*

The two cases last referred to were adjudicated before the erection of our Appellate Courts, but the decision reached by this court in each case resulted, not from weighing conflicting testimony and deciding where lay the greater preponderance, but from determining, as a matter of law, what the rights of the parties were upon a state of facts in reference to which the record disclosed no conflict in the evidence. The inability of the deceased to hear distinguishes this case from a long line of cases relied upon by appellee, in each of which the person injured was in the enjoyment of all his faculties.

In view of the infirmity of the deceased, and in view of the manner in which he had his ears covered, I do not think it can be said that there was evidence which fairly tended to show that he was in the exercise of due care for his personal safety. A verdict for the defendants should have been directed.

The statement contained in the majority opinion relative to the proof, which seems erroneous, but which, if cor-

rect, might justify an affirmance, and which is the only statement of proof found in that opinion which, if accurate, could warrant affirmance, is this: "There is some evidence that when the deceased passed the line of obstructions that prevented his seeing the track he did look." I understand the quoted language to mean that there was proof that he looked west toward the approaching train when he was distant from the crossing approximately twenty-seven feet. As I read the record there was no such proof. If, however, there had been such proof, it is at once manifest that the numerous authorities cited on failure to look and listen have no application here. On the other hand, if there was no such proof, those authorities, stating a familiar doctrine long unquestioned, are still wholly without application, because the majority fail to attach significance to a controlling factor in the case, viz., the inability of the deceased to hear, as he drove upon the track.

It may be here observed that the language quoted by the majority from the case in the 214th Illinois, (p. 606,) had absolutely no bearing upon the question whether there was proof tending to show the exercise of due care on the part of the plaintiff in that case. There, as here, the train was traveling at a rate of speed forbidden by ordinance. The defendant contended that the evidence did not warrant the conclusion that the unlawful rate caused the injury. This court called attention to the language of section 87 of chapter 114, Hurd's Revised Statutes of 1903, in regard to the presumption of negligence arising against a railroad company where its train, running at a rate forbidden by ordinance, does damage to a person or property, and by the quoted language drew the presumption required by the statute as to the cause of the injury, and held that when such presumption arose the defendant could not succeed on the theory that the unlawful rate was not the cause of the injury, unless it offered evidence which rebutted the presumption. That language, as applied to the question then under

discussion, was entirely accurate, but it is misapplied when quoted with reference to the question whether there is proof tending to show that the plaintiff was in the exercise of due care. It bore only on the question of establishing and rebutting the presumption that the forbidden rate of speed was the cause of the injury. Even if such presumption is raised and not rebutted, the plaintiff will still fail to recover if he does not offer evidence tending to show that he was in the exercise of due care. Many persons who saw the accident involved in the case at bar testified. They were examined and cross-examined at great length in reference to many details, and no doubt a detached fragment of the testimony of some witness, if that fragment was considered apart from the remainder of the testimony of that witness, might be regarded as indicating that the deceased looked toward the approaching train before his horses went upon the main track; but, as above indicated, when the testimony of that witness is all considered together, it does not tend to show that the deceased looked in that direction until the moment his team stepped upon the track. The only way to now demonstrate by the evidence that this is so, would be to set out in this opinion all the evidence of each of these witnesses, which, of course, is not practicable. Moreover, appellee has made that labor unnecessary. By his petition for rehearing, in pointing out the alleged misapprehensions of the court as evidenced by the first opinion filed herein, he said:

"This court slightly misunderstands the position of appellee's counsel. *They do not claim* that Shively *looked* either to the east or to the west before his horses reached the crossing. What they claim is this: that Shively *discovered* the approach of the train (by hearing the danger signals) before his horses were upon the main track; that he made this discovery *by the sense of hearing the danger signals,—not by looking at all.* Having once actually made this discovery it was not his duty to look, but to try to get

his horses out of the way, and that this is exactly what he did. In discovering the approach of this train by hearing the alarm signals (the instant he arrived at the twenty-seven foot viewpoint) he certainly *became aware* of its approach just as quickly as if he had actually looked. Whether he looked, therefore, between that point and the main track is wholly immaterial. Looking would have added nothing to what he already knew. His business from the time *he knew,* at the furthest viewpoint, was to save himself and his horses." (The italics are those of counsel for appellee.)

The majority do not base the judgment of affirmance upon this theory of appellee, as to do so would be to subscribe to the doctrine that a traveler, knowing that a train is approaching an intersection which he is about to pass over, need not use his eyes to assist him in avoiding injury.

The judgment cannot be affirmed upon the theory advanced by appellee, because he is wrong about the law. It should not be affirmed upon the theory of the majority, because the majority are, as it appears, in error about the proof.

The only statement of fact contained in the majority opinion in reference to the proof, upon which the judgment could rightfully be affirmed, is, as it seems to me, without foundation in the record, and that statement is expressly disavowed by the language of counsel for appellee above quoted from the petition for rehearing, which was written after counsel had tried the case in three courts and after they had in that way become entirely familiar with all this record contains.

The method pursued by the majority in arriving at the result is unusual and seems to be without precedent in this court. There should be a judgment here reversing and remanding.

CARTWRIGHT, C. J., and CARTER, J.: We concur in the dissenting opinion of Mr. Justice SCOTT.