MARY J. KING, Respondent, v. ST. LOUIS AND SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, April 4, 1910.

1. **RAILROADS: Master and Servant: Duty to Servant at Passageway Across Tracks.** Plaintiff's husband, an employee of defendant railroad, while going to work in another department of the road, was killed by being caught between cars at a plank passageway across tracks of defendant's repair yards. The evidence was conflicting as to whether proper warning had been given to the deceased that a coupling was to be made at the crossing. *Held,* that it was the duty of defendant to exercise

reasonable care to provide a safe passageway for its employees, and whether or not that duty had been performed in this case was a question of fact for the jury.

2. ———: ———: ———.   Where several hundred of the employees of a railroad company, in going to their work in the various departments of the road, pass over a plank passageway across a number of tracks in the company's repair yards, upon most of which tracks are cars on each side of the passageway, it is the duty of the company to give some suitable or reasonable warning for the protection of those employees who are about to cross one of the tracks before suddenly and violently closing the passageway in making a coupling.

3. APPELLATE PRACTICE: Negligence: Question of Law.   Before a court can consider the question of negligence, as a matter of law it must determine that the facts are undisputed and that but one inference can be drawn from them.   The appellate court must indulge every inference of fact in favor of the party offering the evidence which the jury might have indulged, and should be reluctant to hold that but one inference can be drawn from the evidence and then proceed to draw an inference contrary to that of the jury, whose verdict has been approved by the trial court, when there is no showing that either the jury or the judge was prejudiced in the case.

4. EVIDENCE: Positive and Negative Testimony.   Although defendant's several witnesses testified positively to what they saw and heard, and the evidence of plaintiff's witness was largely negative, yet if the plaintiff's witness had an opportunity of hearing and seeing and knowing the facts, it does not follow that the positive statements of the defendant's witnesses should prevail over the negative statements of the plaintiff's witness.

5. CONTRIBUTORY NEGLIGENCE: Railroads: Evidence: Presumption: Physical Facts.   On the question of contributory negligence, where deceased was killed by being caught between cars as they were being coupled at a passageway across defendant's track, over which passageway deceased was going to his work, and under the jury's verdict, accepting the testimony of plaintiff's witness as the true version of the killing from which it does not appear that deceased failed to look or listen for an approaching train before attempting to cross between the cars, the presumption will be indulged, when the physical facts are not such as to overcome it, that deceased did look and listen before attempting to cross the track.

6. ———: ———: Failure to Look and Listen: Jury Question.   While a traveler, about to cross a railroad track, must use ordi-

nary care, which usually demands the use of his faculties of sight and hearing to ascertain whether a train is approaching, failure to look and listen is not negligence as a matter of law under all circumstances; the question usually is one for the jury.

7. ————: **Instructions.** An instruction covering the contributory negligence of the person injured is fatally defective and properly refused where it fails to require the jury to find that the negligence of the injured person *contributed* to the injury.

8. **MASTER AND SERVANT: Negligence: Assumption of Risk: Contributory Negligence.** The servant never assumes risks occasioned by the carelessness or negligence of the master. Therefore if the master's negligence causes injury to the servant the doctrine of assumed risk has no basis on which to stand. That question is eliminated and the question of contributory negligence only can arise.

Appeal from Webster Circuit Court.—*Hon. Argus Cox,* Judge.

AFFIRMED.

*W. F. Evans, W. J. Orr* and *J. H. Orr* for appellant.

(1) The trial court erred in refusing to direct a verdict for the defendant, under the undisputed evidence and the admitted physical facts. Loring v. Railroad, 128 Mo. 349; Aerkfetz v. Humphreys, 145 U. S. 418; Elliott v. Railroad, 150 U. S. 245; Fore v. Railroad, 114 Mo. App. 551, 89 S. W. 1034; Davis v. Railroad, 129 Mo. 1; Sharp v. Railroad, 161 Mo. 214; Zumwalt v. Railroad, 175 Mo. 288; Evans v. Railroad, 178 Mo. 509; Cahill v. Railroad, 205 Mo. 393; Degonia v. Railroad, —— Mo. App. ——, 123 S. W. 807; Bridge Co. v. Bainum, 146 Fed. 367; Columbus, etc., Co. v. Burns, 9 Ohio C. C. 276; Haley v. Railroad, 7 Hun 84; Railroad v. Tabor, 7 Kan. App. 481, 54 Pac. 136. (2) There was no actionable negligence shown on the part of the defendant. Wickham's Admr. v. Railroad, 122 S. W. 154; Conniff v. Railroad, 124 Ky. 763, 99

S. W. 1154; Railroad v. Harrod's Admr. (Ky.), 155
S. W. 699; Cahill v. Railroad, 205 Mo. 393.
(3) King
assumed the risks of injury from moving cars in the
company's yards where he was engaged to work. Adolff
v. Columbia Pretzel Co., 100 Mo. App. 206, 73 S. W.
321; Ives v. Railroad, 107 N. W. 452, 128 Wis. 357;
Vaunday v. Railroad (Wis.), 109 N. W. 926; Railroad
v. Skiles, 10 Am. Neg. Rep. 175; Railroad v. Downs,
106 Fed. 641; Railroad v. Voelker, 129 Fed. 522; Jack-
son v. Railroad, 14 S. W. 54; Williams v. Railroad, 119
Mo. 316, 24 S. W. 782; McKee v. Railroad, 96 Mo. App.
671, 70 S. W. 922; Shields v. Railroad, 87 Mo. App.
637; McDermott v. Railroad, 87 Mo. 285.
(4) King
failed to discharge the legal duty to look and listen for
moving cars and for signals and warnings. Anson v.
Railroad, 87 Pac. 1058; Kelly v. Railroad, 11 Mo. App.
1; Steber v. Railroad (Wis.), 91 N. W. 654; McCarty
v. Railroad, 20 Ohio C. C. 536.

*A. H. Wear, Samuel N. Dickey* and *J. T. White* for
respondent.

(1) It was the duty of the defendant to exercise
reasonable care to provide a safe road along which its
employees must pass. If the road became dangerous by
reason of coupling cars across it while the men (to the
number of five hundred) were going to work, it was
defendant's duty to provide some method of warning
and to warn them of the danger. Koerner v. Car Com-
pany, 209 Mo. 141; Moore v. Railroad, 85 Mo. 588;
Orendorf v. Railroad Ass'n, 116 Mo. App. 348; Snyder
v. Railroad, 54 N. E. 475; Steffe v. Railroad, 156 Mass.
262, 30 N. E. 1137; Railroad v. Hynes, 50 S. W. 624;
Railroad v. Kernochen, 45 N. E. 531; Sours v. Railroad,
84 N. W. 114; Ditberner v. Railroad, 2 N. W. 69;
Schultz v. Railroad, 44 Wis. 638; Hayes v. Railroad, 74
Fed. 279; Taylor v. Railroad, 27 S. W. 663; Felice v.
Railroad, 43 N. Y. S. 922; Farley v. Railroad, 9 N. W.

230; Sites v. Knott, 197 Mo. 684; Gaska v. Car Company, 127 Mo. App. 177; Kingman v. Railroad, 85 Ill. App. 138. (2) Contributory negligence is an affirmative defense, requiring substantial evidence to establish it. The deceased is presumed to have been using reasonable care for his own safety until the contrary is shown. There is no evidence showing that he failed to look or listen. Gurley v. Railroad, 122 Mo. 141; Esler v. Railroad, 109 Mo. App. 580; Bien v. Transit Co., 108 Mo. App. 399; Railroad v. Murphy, 33 N. E. 403; Hayes v. Railroad, 74 Fed. 284; Iron Works v. Weis, 100 Fed. 55; Freeman v. Railroad, 64 S. W. 1; Reed v. Railroad, 107 Mo. App. 246; Mitchell v. Railroad, 122 Mo. App. 50; Bushong v. Gas & Light Co., 79 Mo. 219; Langan v. Railroad, 72 Mo. 392; Drain v. Railroad, 86 Mo. 582; Dietring v. Transit Co., 109 Mo. App. 544; Dixon v. Railroad, 109 Mo. Mo. 413. (3) A servant only assumes such risks as he knows to exist as incident to his employment. He does not assume risks arising from the negligence of the master. Curtis v. McNair, 173 Mo. 270; Cole v. Transit Co., 183 Mo. 94; Lee v. Railroad, 112 Mo. App. 388; Kielty v. Construction Co., 121 Mo. App. 63; Obermeyer v. Chair Mfg. Co., 120 Mo. App. 73; Stafford v. Adams, 113 Mo. App. 723; Shore v. Bridge Co., 111 Mo. App. 290; Harrod v. Packing Co., 102 S. W. 639; Dakan v. Chase, 197 Mo. 267; Dean v. Woodenware Works, 106 Mo. App. 167; Garaci v. Const. Co., 124 Mo. App. 718; Koerner v. Car Company, 209 Mo. 158. Under the above cases if the master is negligent, the question of assumption of risk is eliminated. The question of contributory negligence alone could arise. (4) The care and caution required of a railroad company in running its trains is commensurate with the danger to persons and property incident to the time and place of operating it. More care is required where many persons are passing than at other places. Kube v. Transit Co., 103 Mo. App. 593; Fry v. Transit Co., 111 Mo. App. 338; Murray v. Transit

Co., 108 Mo. App. 505; Van Natta v. Railroad, 133 Mo. 19. (5) The instruction asked by defendant on contributory negligence was properly refused for several reasons: (a) It does not require the jury to find that King's alleged negligence contributed to his injury. It assumed a fact required to be proven, that his failure to exercise care was the proximate cause of his injury. Johnson v. Railroad, 117 Mo. App. 308; Neas v. Railroad, 120 S. W. 120; York v. Everton, 122 Mo. App. 207; Maxwell v. Railway, 85 Mo. 95. (b) It requires that King must have exercised extraordinary care. Ordinary care is all that was required of him. Ordinary care required him to look and listen, but did not require him to stop at every track he came to, as the instruction did. Dietring v. Transit Co., 109 Mo. App. 550; Esler v. Railroad, 109 Mo. App. 580; Mitchel v. Railroad, 122 Mo. App. 50.

STATEMENT.—This was an action brought by the widow of W. C. King, who on the 30th day of September, 1904, at the city of Springfield, Missouri, was killed by being struck by defendant's cars while attempting to cross a railroad track of the defendant company in its switch yards. The plaintiff obtained judgment for the sum of five thousand dollars from which an appeal has been perfected by the defendant to this court.

As no question is raised over the pleadings, they are not inserted.

The place where plaintiff's husband was killed was where a plank passageway extended at right angles across a number of tracks in the switch yards of the defendant. These tracks, a dozen or more in number, were parallel, running east and west, and the plank passageway was about twelve feet in width, extending across the tracks from north to south. This part of the yard was used for standing cars which were crippled or for any reason out of use. A large number of cars

usually stood on these tracks, leaving a space between the ends of the cars about twelve feet wide, a sort of a lane between the ends of the cars, which were backed up on either side of the passageway. This space between the cars was necessary for the men to use in going to and from their work and to and from the place where, under the rules of the company, they were required to register each morning before going to work. Appellant says that this road was constructed for the use of employees, presumably for the purpose of affording them a reasonably safe passageway and preventing injuries that might occur if the men were allowed to become scattered promiscuously while crossing the tracks. Some five hundred employees passed every day over this plank roadway formed by cutting the trains. The passing of the employees over this roadway generally occurred just before beginning their work in the morning between six and seven o'clock and at noon and night after their work was done.

On the morning of the accident, the tracks were full of cars when W. C. King passed along the roadway between the cars which were backed up on either side against the roadway. It was about twenty minutes of seven o'clock, the time when the five hundred employees were accustomed to cross over the passageway going to work and to register as required by the rules of the company. King had been at work in the yards eight or nine days, but so far as the evidence shows had never worked about the yards or shops before that time; but he had worked for the company several years on construction work with shovel and bridge gangs. He was going to work that day temporarily on scrapiron, but in what particular part of the yards does not appear; however, it was not at or near the place where he was killed.

The evidence tended to show that during the time King had worked about the yards, the cars had never been coupled across this passageway in his presence

while the men were going to work, but that the coupling was usually done early in the morning before the employees began to cross the tracks.

Appellant's switchman, W. F. Deaton, testified that on this particular morning he was told by his foreman to go down and watch the crossing (where the injury occurred); that it was then about six o'clock and people would be passing there. "He told me to go down there and watch the crossing and to make the coupling and he would make the other coupling and watch the other crossing. He told me to stay there until the cars got together. They generally tried to get the cars out before the men went to work, but they were a little late that morning and the men had already commenced to go to work."

King passed along the passageway on the morning he was killed, going south towards the place where he was required to register, and this, as before stated, was about twenty minutes of seven o'clock. When he got upon track No. 11, which was apparently about halfway from the north to the south side of the passageway, he was caught and crushed to death by a train backing across the passageway from the west against a car on the opposite side. The tracks of the defendant company on the west side turned sharply towards the south. There was a train on the west side of the passageway on track No. 11, with seven cars to the first cut which stood next to the crossing, and this train had been cut in three sections. The engine was around the curve on the other side of the roundhouse and out of sight of a person traveling over the passageway. There were perhaps about twenty cars in the train, including the engine, standing west of the passageway on track No. 11. Right at the crossing on the east side of the passageway was a boxcar; on the west side next to the passageway was a flatcar.

The evidence as to what took place at the time King approached the crossing is conflicting. The evi-

dence for the defendant tended to show that at the time
King approached to cross track No. 11, the defendant's
switchman, Deaton, stood facing King looking north in
plain view within a few feet of him, and that by mo-
tioning, calling and hallooing, the switchman warned
King not to go upon the track, but that deceased paid
no heed to the warnings and went upon the track
without stopping to look or to listen; that he was
caught between the boxcar and the flatcar receiving in-
juries from which he soon died; that at the place of the
accident and soon thereafter, deceased declared to Dea-
ton, the switchman, that he and not the company was
to blame for the injury. The testimony of two other
witnesses tended to corroborate Deaton as to his warn-
ings to King not to go upon the track.

The evidence for the plaintiff tended to show that
H. J. Height, brother-in-law of deceased, was a few
feet behind King and also in the passageway at the
time of the accident; that he too was going south but
was some thirty feet behind King and in plain view
of him at the time the accident occurred. He testified
that looking south from where he stood, at the time of
the accident there was no person in view on the south
side of track No. 11 and that no notice was given to
deceased; that if any person had been south of the track
near the place of the accident, he would have seen him.
He further testified that he was at the place of the ac-
cident immediately after it occurred; that he took his
brother-in-law in his arms and remained with him until
he was removed in an ambulance, and that King made
no statement as to his being to blame; that King made
no statement to anyone except to him, and made no
statement to Deaton, the switchman. That King's only
remark was when he asked him (Height) to go and get
his boy and said, "It is all over with me, boys." The
evidence also tended to show that King on approaching
track No. 11 could only see four or five carlengths to

King v. Railroad.

the west and could not have seen the first cut in the train west of the passageway.

NIXON, P. J.—I. The appellant has assigned as reversible error that its demurrer to the evidence should have been sustained and judgment should have been given by the court for the defendant. This necessitates to some extent a review of the evidence as to the events which took place at the crossing at the time King was killed.

The deceased was killed in the shop yards of the defendant at Springfield at the place where he was crossing track No. 11. As shown by the statement, the passageway left for the use of defendant's employees extended north and south across a dozen or more railroad tracks. These tracks ran east and west, and the plank passageway—about twelve feet wide—extended north and south across them. The yard was used for crippled cars or cars which for any reason were out of use.

The evidence tended to show that it was the duty of some five hundred of appellant's employees every morning to pass over this roadway between the cars which stood on either side. That during the time King had worked in the yards, the cars on either side of this passageway had not been coupled in his presence while the men were going to work, and that it was usual to do the coupling early in the morning before the employees began to cross the tracks. The evidence further shows that the switchman, Deaton, was sent down to this particular crossing at about six o'clock to watch it; that his foreman told him to watch the crossing and to make the coupling and to stay there until the cars got together; that they generally tried to get the cars out before the men went to work, but that they were a little late that morning and the men had already commenced to cross. The appellant also introduced evidence tending to show that Deaton did go down to the crossing

and gave the deceased warning at the time he was about to cross this track, while the evidence for the respondent tended to show that no warning whatever was given.

Under the evidence, it was the duty of the defendant to exercise reasonable care to provide a safe passageway for its employees. If this passageway became dangerous by reason of coupling cars across it while employees to the number of some five hundred were going to work, and if the defendant—as the evidence of the plaintiff tends to show—suddenly and violently coupled its cars across this passageway without any warning, it was derelict in its duty to protect the lives and limbs of its employees. The question of its negligence under the evidence offered by the plaintiff became one of fact for the jury, and their conclusions upon appeal are binding upon us. If the defendant failed in its duty under the circumstances, it was negligent; and whether it exercised reasonable care to provide for the safety of the deceased by warning him of the danger at the time, under the conflicting evidence, was properly submitted to the jury. [Koerner v. St. L. Car Co., 209 Mo. loc. cit. 160, 107 S. W. 481; Moore v. W., St. L. & P. Ry. Co., 85 Mo. loc. cit. 598; Gurley v. Mo. Pac. Ry. Co., 104 Mo. loc. cit. 232, 16 S. W. 11; Gurley v. Mo. Pac. Ry. Co., 122 Mo. 141, 26 S. W. 953.]

The evidence shows that it was a custom of the defendant to do its switching early in the morning before the men were crossing over the passageway, and thereafter to leave an opening between the cars for its employees to pass to and from their work. Under such circumstances, it would unquestionably be the duty of the defendant to give some suitable or reasonable warning for the protection of its employees who were using the passageway, before suddenly and violently closing

143 App—19

the same. And the jury might well have supposed that the deceased had a right to conclude that under the circumstances it would be safe for him to cross if he had not been advised that the defendant was about to close this gap or opening, and if he acted upon this invitation, he should be protected. [Sites v. Knott, 197 Mo. loc. cit. 717, 96 S. W. 206.]

II. The appellant further contends that the judgment should be reversed because on the uncontradicted evidence and physical facts the deceased was guilty of contributory negligence.

As to what took place at the crossing at the time and immediately before King went upon track No. 11, the evidence is in sharp and irreconcilable conflict, a preponderance of the evidence showing that proper and repeated warnings were given of the imminent peril in which King was placing himself, but that he paid no heed whatever and continued to walk onto the track; that before entering upon the track, he did not stop to look or listen, and that immediately after the accident he stated that he and not the company was to blame for the accident. It further appeared that this all occurred in the daytime and that deceased was an adult in possession of his faculties of sight and hearing.

The evidence on the part of the plaintiff, as given by the witness, Height, brother-in-law of the deceased, tended to show that he was some thirty feet north of King at the time of the accident and was going south in the same direction as King; that he was in plain view of King, and that if any person had been on this passageway south of track No. 11 or near it, he could have seen him and heard the warnings that were said to have been given to King; that such person would have been as plainly in his view as in the view of King; that no person was near the crossing or gave any warning, and that he was the first person to reach King after the injury; that he held King in his arms until

he was carried away in an ambulance, and that King made no statement to Deaton to the effect that he (King) was to blame for the accident and not the company.

The rules established for the guidance of appellate courts in the determination of the sufficiency of evidence to withstand a demurrer have been variously stated, but in their last analysis converge upon one point, that however great the weight or preponderance of the evidence, it is for the jury to consider the credibility of the witnesses and the weight of the testimony by comparing and considering the balancing probabilities. And further, the general rule is, that if there is any substantial evidence which, standing alone, and when considered apart from opposing testimony, tends to support the verdict, the appellate court must indulge every inference of fact in favor of the party offering the evidence which the jury might have indulged. Otherwise stated, the rule is, before a court can consider the question of negligence as a matter of law, it must determine that the facts are undisputed and that but one inference can be drawn from them; and an appellate court should be reluctant to hold that but one inference can be drawn from the evidence and then proceed to draw an inference contrary to that of the jury, whose verdict has been approved by the trial court, when there is no showing that either the jury or the judge were prejudiced in the case. No citation of authorities is necessary to sustain these elementary principles.

Applying these rules to the solution of the questions presented for our consideration, the testimony of plaintiff's witness, Height, so far as our consideration is concerned, effectually obliterates from the record all the testimony of the defendant as to what took place at the time of the killing of King at the crossing for the reason that his testimony contradicts all the

evidence offered by the defendant as to contributory negligence.

Height's testimony was as follows: "I was between the tracks at the time of the sudden slam of the cars back west. I was between the rails of the track I was on. I heard the slam. When I heard it, I jumped out from between the rails of the track. I was as quick as I could be. At that time, I saw the car dragging Mr. King and it slammed him against the other car, it was that quick. There must have been at that time two or three tracks between us; we must have been as much as thirty feet apart. I could not see the track and see the moving cars on account of the cars being blocked. There was a curve down there; it curved to the south. I could not see the engine or anybody on the cars. A flatcar caught King. My attention was first directed by the slam of the cars. At the time I heard the slam of the cars, King was between the rails of the track he was caught on. "Q. Were you looking at him at that time? A. Yes, sir, I saw him; he was right square in front of me in just as fair view as you are there. Q. Did he have time to get off the track after you heard the slam of the cars? A. I don't think anybody could have got off. Q. Did he have time to get out of its way before the crash? A. No, sir; I could not have had time to get out of the way if it had been me in his place. I could not have had time to get out of its way if it had been on the track I was on. Q. Now what effect did it have when the cars came together with Mr. King? A. He was over the coupling on the drawhead when the car caught him. His clothes were sticking to the drawhead when they pulled away. Q. When you were on the track you heard the cars coupling up somewhere west of you? A. Yes, sir; I jumped out from between the rails. Q. You could not tell on what part of the track or what particular track the coupling was on? A. No, sir. Q. Did you hear the noise of the coupling of the train before you heard the

slam of the cars? A. No, sir. Q. Did you hear any outcry or hallooing? A. After I saw it strike King or something like that time, I heard a 'Look out!' I don't know who it was that hallooed 'Look out!' Q. Was there anybody between you and King? A. No, sir; there was no one between me and King on the north side. Q. Could you see plainly down on the other side of the track where he was? A. Yes, sir. Q. Was there anybody there to give warning? A. No, sir; there was nobody there that I saw; there was nobody there near. Q. What part of the roadway were you on? A. I was about center-ways of it. Q. On what part of that roadway was Mr. King? A. He seemed to be about the center of it; he was something close to the center of that roadway. We did not have more than ten or twelve feet of a roadway to walk in there. Q. How fast did that car come back? A. It came back tolerably fast and with tolerably good force. Q. Now then, could you have seen a man there at the track where King was caught, standing there and hallooing and waving to him, if there had been a man there? A. Yes, sir; I could have seen a man there if he had been there unless he had been standing behind the cars. Q. Could you have seen a man there if Mr. King could have seen him? A. Yes, sir; it looks like I could have seen him because 1 was close enough to that crossing; we were close enough together that it looks like I could have seen him if Mr. King could have seen him. Q. Were you looking in the same direction? A. Yes sir."

It will be observed that if what this witness testified is true and if the jury were authorized to draw reasonable inferences from his statements to the exclusion of the conflicting testimony, there was no other person present at the time the accident happened, and the entire testimony of the defendant as to contributory negligence is thereby discredited. It is true that the evidence of this witness on the part of the plaintiff was largely negative, while the witnesses for the de-

fendant testified in positive terms as to what they saw and heard. But if the plaintiff's witness had an opportunity of hearing and seeing and knowing the facts, it does not follow that the positive statements of the defendant's witnesses should prevail over the negative statements of the plaintiff's witness. In any event, much would depend upon the situation and position of the witnesses and the attention they were giving to the occurrences at the time. These matters, and the credit to be given to the several witnesses were questions for the jury, and the ultimate question of contributory negligence was, under such evidence, properly submitted to the jury. [Murray v. Mo. Pac. Ry. Co., 101 Mo. loc. cit. 242, 13 S. W. 817; Isaacs v. Skrainka, 95 Mo. 517, 8 S. W. 427; State ex rel. v. K. C., Ft. S. & M. Ry. Co., 70 Mo. App. 634; Stotler v. C. & A. Ry. Co., 200 Mo. 107.]

In the Stotler case, supra, the court holds that a negative fact may be proved by negative evidence. That defendant's failure to give signals may be proved by those in a position to hear who did not hear that such testimony is not overthrown by positive testimony of the engineer, fireman and other employees of the defendant that the signals were timely given, for the issue still is one of fact for the jury.

A legitimate inference the jury was authorized to draw from this testimony was that at the time of the coupling of the cars, the deceased had already stepped onto this track No. 11, and that the slam of the coupling to the west of him and the striking of his body by the flatcar was so rapid and sudden as to be almost instantaneous. And Height did not hear any movement of the cars until the moment of the coupling. Under such evidence, it was a question of fact for the jury to say whether if the deceased before entering upon the track had looked or listened, he could have seen or heard the movement of the cars. If Height's evidence was accepted by the jury as the true version of the oc-

currence, there is no evidence showing that King failed to look or listen, and the presumption would be indulged, in the absence of such evidence, that the deceased did look and listen before attempting to cross the track; that is, that he was exercising proper care. [Weller v. C., M. & St. P. Ry. Co., 164 Mo. loc. cit. 198, 64 S. W. 141; Eckhard v. St. L. T. Co., 190 Mo. loc. cit. 613, 89 S. W. 602; Mockowik v. K. C., St. J. & C. B. R. Co., 196 Mo. loc. cit. 571, 94 S. W. 256.]

Nor do the physical facts developed in this case impeach or overthrow the probative force of the negative evidence and of the presumptions that the law indulges. Nowhere in this evidence is it made to appear that King on approaching track No. 11 from the north could see the engine attached to the train west of the passageway. On the contrary, the evidence of the defendant by its switchman and by the photographs introduced in evidence tend strongly to prove that King when he approached the track, if he had looked, could not have seen the opening or cut at the end of the first section of the six or seven cars west of the opening. It was a fair inference from the evidence that the engine which moved the train that caused the injury was west and south, around a sharp curve toward the south, and under the physical surroundings deceased could not have seen over five or six carlengths to the west.

While a traveler, about to cross a railroad track, must use ordinary care, which usually demands the use of his faculties of sight and hearing to ascertain whether a train is approaching, failure to look and listen is not negligence as a matter of law under all circumstances and under all circumstances barring a recovery, the question usually being one for the jury. [Winn v. C., C., C. & St. L. Ry. Co. (Ill.), 87 N. E. 954; Mullens v. N. Y., N. H. & H. R. Co. (Mass.), 87 N. E. 476; Dunwoody v. M. K. & T. Ry. Co., 136 Mo. App. 509, 118 S. W. 503.]

The physical facts then do not classify this case as one where to look is to see danger and to listen is to hear danger. In such cases, the physical facts themselves oftentimes demonstrate to a moral certainty the negligence of the deceased. The appellant has given great prominence in both its brief and its reply brief to this class of cases, and has with great earnestness and ability urged that the present case should be reversed on the strength of the opinion in the case of Loring v. K. C., F. S. & M. Ry. Co., 128 Mo. 349, 31 S. W. 6. The marked distinction of that case from the present appears on a slight inspection of the facts as stated in that opinion and on which it was based. The Supreme Court in its consideration of that case said: "As (witness) Murray says: . . . 'Neither Loring nor I looked toward the cars; we were both looking the way we were going; we had barely time to step on the track when we were struck.'" Not only that, but the opinion further recites that the physical surroundings of Loring at the time of his injury were such that if he had looked he would have seen the danger, and if he had listened he would have heard the approach of the danger. "It was simply impossible for Loring to have looked west for an approaching train and not have seen the cars being shoved by the switch engine. The track was wholly unobstructed; it was daylight; the cars were in plain view and close at hand, and in such a case, when he stepped upon the track and was struck by the train, he would be conclusively presumed to have disregarded his duty to look and listen, if the positive and unequivocal evidence of all the witnesses had not affirmatively established that he did not look, and his negligence precludes his right to recover."

In this case, there were facts tending to show that if King before he stepped upon the track had looked and listened, he would *not* have seen that danger was imminent or that the cars were in motion; and further, under the evidence of Height, there was no witness

present at the time and place of the accident to testify that King did not look and listen, and the law presumes that he did exercise his faculties and looked and listened. Under this state of facts, there can be no parallel of this case with the Loring case and others cited by appellant of a similar nature, and that case, consequently, is not an authority for principles such as are involved under the facts of this case.

Hence, as to the negligence of the deceased, it was within the legal province of the jury to believe the testimony of plaintiff's witness, Height, though negative, to the absolute exclusion of all the affirmative evidence to the contrary of defendant's witnesses. For the appellate court to sustain the demurrer to the evidence would be a palpable invasion of the right of trial by jury.

III. The defendant asked and the court refused the following instruction:

"You are further instructed that even if no warnings were given, and even if no signals by bell or whistle were given and even if the cars were moved violently and suddenly or with great force over this crossing, still, if King as he approached said crossing could have discovered that these cars were about to be moved or were moving over this crossing, by looking or listening, or if, on account of obstructions, by stopping and looking and listening before stepping onto or so near the track as to be injured, then it was his duty to do so and a failure to take these precautions would be such want of care on his part as will defeat any recovery for his death.".

It is claimed that the refusal by the court to give this instruction was material error for which this judgment should be reversed. This instruction was fatally defective and properly refused because there is not a word in it which requires the jury to find that King's negligence *contributed* to the injury. Although

it may have been negligence, such negligence to constitute a defense must have been proximate or concurrent and have contributed to the injury. It is a self-evident proposition that contributory negligence to constitute a defense must contribute to the injury. The instruction was properly refused.

IV. The defendant asked and the court refused the following instruction on assumed risk:

"You are further instructed that while the law requires the railroad company to exercise reasonable and ordinary care for the safety of its employees, it is not an insurer of their safety, and it is not required to select the best and safest methods and devices for conducting its business, but it may select its own plans, methods and devices so long as those it does select are reaonably safe, and all persons entering the service or remaining therein are in law deemed to have contracted with reference to the methods and plans and devices used and adopted by the railroad company and are held in law to have assumed the usual and ordinary risks incident to the business as thus conducted, and the railroad is not liable if any such person is injured by reason of the manner or method adopted if these are reasonably safe. And a method is reasonably safe when the employees can by the exercise of ordinary care on their part, avoid the dangers usually incident thereto. So, if you find that King was injured by reason of one of the hazards or risks usually incident to the business, and that the methods adopted were reasonably safe as herein defined, then there can be no recovery herein by plaintiff."

This instruction was properly refused. The servant does not assume risks arising from the negligence of the master. If the master is negligent, the question of assumption of risk is eliminated and the question of contributory negligence only arises. This principle has seemingly been put at rest—at least for the present—

by the latest decision on the question by our Supreme Court in the case of George v. Railroad, 125 S. W. 196. And this court, Judge Cox delivering the opinion at this term, in the case of Strickland v. F. W. Woolworth & Co., has deduced the following conclusions as the established law in this State as to assumption of risk:

"The servant never assumes risks occasioned by the carelessness or negligence of the master. Therefore, if the master's negligence causes injury to the servant, the doctrine of assumed risk has no basis on which to stand, for to do so would violate other well-established rules of law, to-wit:

"1. It is the duty of the master to furnish the servant a reasonably safe place in which to work.

"2. The law will not permit any person to contract against his own negligence.

"To say that a servant may, by contract, assume the risks resulting from the master's negligence, or to say that by continuing in the service of his master, after full knowledge of the risks to which his employment would expose him, he assumes such risk, even though the danger be caused by the negligence of the master, would be to set aside both of the salutary rules above mentioned.

"The risks which the servant assumes are those which are incident to his employment while the master properly discharges his duty toward him, but when the master steps over those bounds and becomes himself chargeable with negligence, then as to the results of that negligence, there can be no assumption of risk by the servant."

Finding no error in the instructions given by the court and no reversible error in the case, the judgment is affirmed. *Gray, J.,* concurs. *Cox, J.,* having presided as judge in the trial court, not sitting.